[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-15752
_____

D.C. Docket No. 1:11-cv-24637-MGC

ROBERTO VALDERRAMA,

Plaintiff - Appellee,

versus

OFFICER CARL ROUSSEAU,
BRAULIO GONZALEZ,
YASMINA SMITH,
f.k.a. Yasmina Elayacoubi,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 16, 2015)

Before TJOFLAT, JILL PRYOR and COX, Circuit Judges.

JILL PRYOR, Circuit Judge:

In the early morning hours of January 24, 2006, Detective Carl Rousseau of the Miami-Dade County Police Department stopped a vehicle driven by Ricardo Garcia. During the traffic stop, Detective Rousseau shot Mr. Garcia's passenger, Roberto Valderrama, in the genitals. After he was shot, Mr. Valderrama was arrested for possession of cocaine and drug paraphernalia, although the charges ultimately were dropped. This appeal arises out of a civil lawsuit Mr. Valderrama filed against Detective Rousseau and two other officers involved in his arrest, Sergeants Yasmina Smith and Braulio Gonzalez. Mr. Valderrama brought claims under 42 U.S.C. § 1983 against the officers for excessive use of force, false arrest, and deliberate indifference to his serious medical need, as well as other claims under state law. The officers moved for summary judgment based on qualified immunity and state law sovereign immunity. The district court granted in part and denied in part their motions, and the officers appealed. We affirm in part, reverse in part, and dismiss in part for lack of subject matter jurisdiction.

## I.    FACTUAL BACKGROUND

Around 6:30 a.m. on January 24, 2006, Detective Rousseau, Sergeant Smith, and Sergeant Gonzalez were patrolling Miami's Overtown neighborhood in separate, unmarked police cars. Detective Rousseau claims he stopped Mr. Garcia's car because he saw a pedestrian approach the car and hand the passenger a

2

metallic object that appeared to be a weapon.  Both Messrs. Valderrama and Garcia testified, however, that no pedestrian approached Mr. Garcia's car and that neither occupant of the car had a firearm.[1]

At the time Detective Rousseau stopped Mr. Garcia's vehicle, Sergeant Smith was driving by and came to assist.  Sergeant Smith initially stopped her car behind Detective Rousseau's, but she moved it after Detective Rousseau radioed her to request that she pull in front of Mr. Garcia's car.  Sergeant Smith then exited her car and approached Mr. Garcia's.  Once outside her vehicle, Sergeant Smith saw Mr. Valderrama throw what appeared to be a crack pipe out the car window. Mr. Valderrama admits that Mr. Garcia had a crack pipe in the car, that Mr. Garcia told him to throw the pipe out the window when they were stopped, and that he did in fact throw the pipe out the passenger side window.

Upon approaching Mr. Garcia's vehicle, Detective Rousseau directed him in English to put his hands up.  When Detective Rousseau repeated the direction in Spanish, Mr. Garcia complied.  Mr. Valderrama testified that at this time he had his hands placed "on [his] knees or against [his] stomach" to make sure they were visible to Detective Rousseau.  Valderrama Decl. ¶ 15.  Throughout this encounter, Detective Rousseau had his gun pointed at Mr. Garcia's head.  Detective Rousseau

---

[1] We view the evidence in the light most favorable to Mr. Valderrama because the officers moved for summary judgment.  *See Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

then fired a shot at Mr. Valderrama; the bullet penetrated his penis, exited his scrotum and testicle, entered his thigh, and exited his buttock.  It is undisputed that the shooting occurred at 6:30:42 a.m., approximately 20 seconds after Detective Rousseau approached the car.

Sergeant Smith heard the gunshot.  She asked Detective Rousseau if he had fired his gun, but he did not answer her.  She then approached Mr. Garcia's car and saw Mr. Valderrama bleeding from his groin.  She directed Mr. Valderrama to get out of the car, and he did.  When Sergeant Smith saw the blood on Mr. Valderrama's blue jeans, she cried out "Oh, my God!"  Valderrama Decl. ¶ 50.  Mr. Valderrama asked Sergeant Smith to call an ambulance for him; instead, she directed him to sit down.

Sergeant Smith then spoke with Detective Rousseau about the shooting.  Detective Rousseau told Sergeant Smith he shot Mr. Valderrama, and they discussed that Mr. Valderrama was bleeding.  Detective Rousseau testified that he directed Sergeant Smith to call an ambulance, but she did not do so immediately.  Detective Rousseau then began to search Mr. Garcia's car, but he found nothing except an old car radio in the backseat.

At 6:34:15 a.m., approximately three and a half minutes after the shooting, Sergeant Smith called police dispatch to request an ambulance.  Although Sergeant Smith knew that Mr. Valderrama had been shot and that blood was seeping

4

through his pants, she did not report a gunshot wound. Instead, she reported "ahh, a laceration"—that is, a cut. She did, however, request assistance "on the three," which the officers claim means as quickly as possible. The police dispatcher then called fire and rescue dispatch and requested an ambulance to treat a laceration. Given the minor injuries generally associated with lacerations, fire and rescue dispatch assigned the call the lowest priority. An ambulance was not dispatched until 6:39 a.m. and only arrived on the scene at 6:45 a.m. In total, it took eleven minutes for the ambulance to arrive after Sergeant Smith reported the laceration. If Sergeant Smith had reported the injury as a gunshot wound, however, the request would have received the highest priority, and an ambulance would have arrived within four minutes of her call.

Sergeant Gonzalez arrived on the scene two to three minutes after the shooting. Detective Rousseau directed him to contact their supervisor, Sergeant Malgor, to inform him of the shooting. Sergeant Gonzalez called Sergeant Malgor shortly before Sergeant Smith called dispatch to request an ambulance for Mr. Valderrama.

At some point, Detective Rousseau returned to his car. Timothy Burney, whom Detective Rousseau had arrested earlier for possession of cocaine, was in the backseat of Detective Rousseau's vehicle. Mr. Burney testified that Detective

Rousseau offered to drop the cocaine charges if Mr. Burney would say he saw Mr. Valderrama holding a shiny object when the shot was fired.

Mr. Valderrama filed a lawsuit in Florida state court against the officers. He amended his complaint to add federal claims under 42 U.S.C. § 1983, and the officers removed the case to federal court. The officers moved for summary judgment on the ground that they were entitled to qualified immunity as to Mr. Valderrama's § 1983 claims. The district court granted their motions in part, but it denied them qualified immunity as to several of the § 1983 claims. The officers now appeal the denial of qualified immunity as to Mr. Valderrama's § 1983 claims for false arrest and deliberate indifference to his serious medical need.[2] The officers also appeal the denial of summary judgment on Mr. Valderrama's state law claims for false arrest, concert of action, and civil conspiracy.[3]

---

[2] Detective Rousseau has not appealed the district court's denial of summary judgment on and qualified immunity from Mr. Valderrama's § 1983 claim asserting that Detective Rousseau used excessive force.

[3] We lack jurisdiction to review the denial of summary judgment on Mr. Valderrama's state law claims for concert of action and civil conspiracy. Although the officers ask us to review the denial of summary judgment on the state law claims under the doctrine of pendent appellate jurisdiction, that doctrine "is limited to questions that are inextricably interwoven with an issue properly before [this Court]." *See Harris v. Bd. of Educ. of Atlanta*, 105 F.3d 591, 594 (11th Cir. 1997) (internal quotation marks omitted). Mr. Valderrama's state law claims for concert of action and civil conspiracy relate to Detective Rousseau's alleged excessive use of force, which is not an issue before the Court on this interlocutory appeal. Because "we may resolve the qualified immunity issue without reaching the merits" of the state law claims for concert of action and civil conspiracy, we lack jurisdiction to reach those claims. *Id.* at 595. In contrast, Mr. Valderrama's state law claims for false arrest are "inextricably intertwined" with an issue—the existence of arguable probable cause—that is properly before this Court on the officers' appeal from the denial of qualified immunity. Therefore, we exercise our pendent appellate jurisdiction to address Mr. Valderrama's state law claims for false arrest.

## II.    STANDARD OF REVIEW

"On an interlocutory appeal from the denial of qualified immunity, this Court conducts a *de novo* review." *Kjellsen v. Mills*, 517 F.3d 1232, 1236 (11th Cir. 2008). We view the facts in the light most favorable to the nonmoving party. *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006). We must also draw "all reasonable inferences in favor of the party opposing summary judgment." *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir. 1999). Summary judgment should be granted when the record evidence shows there is no genuine dispute concerning any material fact and the movant is entitled to judgment as a matter of law. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (citing Fed. R. Civ. P. 56(a)). Conclusory allegations and speculation are insufficient to create a genuine issue of material fact. *See Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.").

## III.    DISCUSSION

A government official asserting a qualified immunity defense bears the initial burden of showing "he was acting within his discretionary authority." *Skop*

*v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007).[4]  After the official makes

this showing, the burden shifts to the plaintiff to show that "(1) the defendant

violated a constitutional right, and (2) this right was clearly established at the time

of the alleged violation."  *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252,

1264 (11th Cir. 2004).  To determine whether a right was clearly established, we

look to binding decisions of the Supreme Court of the United States, this Court,

and the highest court of the relevant state (here, Florida).  *McClish v. Nugent*, 483

F.3d 1231, 1237 (11th Cir. 2007).  In the light of these decisions, we ask "whether

it would be clear to a reasonable officer that his conduct was unlawful in the

situation he confronted."  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  As we have

explained:

> While officials must have fair warning that their acts are
> unconstitutional, there need not be a case "on all fours," with
> materially identical facts, before we will allow suits against them.  A
> principle of constitutional law can be "clearly established" even if
> there are "notable factual distinctions between the precedents relied
> on and the cases then before the Court, so long as the prior decisions
> gave reasonable warning that the conduct at issue violated
> constitutional rights."

*Holloman*, 370 F.3d at 1277 (quoting *United States v. Lanier*, 520 U.S. 259, 269

(1997)).  Nevertheless, officers are not required to be "creative or imaginative in

drawing analogies from previously decided cases."  *Pace v. Capobianco*, 283 F.3d

---

[4] Mr. Valderrama concedes that the officers were acting within the scope of their discretionary authority.

1275, 1282 (11th Cir. 2002) (internal quotation marks omitted).  The "salient question" here is whether the state of the law gave police officers "fair warning" that their conduct was unconstitutional.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

A. Mr. Valderrama's § 1983 Claims Based on Fourth Amendment Violations

In denying summary judgment to the officers on Mr. Valderrama's § 1983 claims alleging violations of the Fourth Amendment, the district court concluded that the officers were not entitled to qualified immunity because there was a genuine issue of material fact concerning whether they had probable cause to arrest Mr. Valderrama.  The district court found there was a disputed factual issue because, according to Mr. Valderrama, he threw the crack pipe out of the car before Detective Rousseau and Sergeant Smith "exit[ed] their vehicles to witness such action."  *Valderrama v. Rousseau*, No. 1:11-cv-24637, slip op. at 13 (S.D. Fla. Dec. 11, 2013).  Therefore, the district court reasoned, Mr. Valderrama had "present[ed] evidence that Sgt. Smith did not and could not have witnesse[d] the possession" of the crack pipe.  *Id.* at 15.  Without undisputed facts establishing probable cause, the arrest could have been actionable under § 1983.  The district court denied summary judgment on Mr. Valderrama's state law false arrest claims for the same reason.  We reverse the district court because the undisputed evidence shows that the officers had probable cause to arrest Mr. Valderrama, and thus he has failed to establish a violation of his Fourth Amendment rights.

9

It is clearly established that an arrest made without probable cause is a violation of an arrestee's clearly established Fourth Amendment rights.[5] *See Redd v. City of Enter.*, 140 F.3d 1378, 1382 (11th Cir. 1998). In the context of § 1983, however, a police officer may be entitled to qualified immunity even if there was no actual probable cause for an arrest. *Durruthy v. Pastor*, 351 F.3d 1080, 1089 (11th Cir. 2003). When an officer raises a qualified immunity defense in a § 1983 case, the officer will prevail if there was arguable probable cause for the arrest. *Id.*

In this case, the officers came forward with evidence showing that they had actual probable cause to arrest Mr. Valderrama. Sergeant Smith testified that she had "a direct line of vision . . . through the windshield" of Mr. Garcia's car and saw Mr. Valderrama throw a small glass pipe that she believed to be drug paraphernalia out the window. Sergeant Smith's testimony is sufficient to show probable cause that Mr. Valderrama had committed the crime of possession of drug paraphernalia. *See Case v. Eslinger*, 555 F.3d 1317, 1327 (11th Cir. 2009) (noting that probable cause "requires only a probability or substantial chance of criminal activities" (internal quotation marks omitted)); *see also* Fla. Stat. § 893.147(1) ("It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia . . . .").

---

[5] The same standard applies to Mr. Valderrama's corresponding state law claims. Under Florida law, officers must have probable cause before making an arrest. *See Cross v. State*, 432 So. 2d 780, 782 (Fla. Dist. Ct. App. 1983).

10

Because the officers presented evidence showing the existence of probable cause, the burden then shifted to Mr. Valderrama to "point to other portions of the record that would show that there was indeed a genuine issue of fact regarding the [probable cause] issue." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 607-08 (11th Cir. 1991). Although Mr. Valderrama argues that there is a disputed issue of material fact about whether Sergeant Smith in fact saw him throw the crack pipe, none of the record evidence Mr. Valderrama cites is sufficient to satisfy his burden and defeat summary judgment.

First, Mr. Valderrama argues that his own deposition testimony shows it was impossible for Sergeant Smith to have seen him discard the pipe. Mr. Valderrama testified that when he threw the pipe, Sergeant Smith had parked and was "getting out of [her] car." Deposition of Roberto Valderrama at 58. Testimony that Sergeant Smith was getting out of her car does not show that it was impossible for her to see Mr. Valderrama throw the pipe, nor does it support such an inference. Mr. Valderrama's mere speculation that it was impossible cannot create a disputed issue of material fact. *See Cordoba*, 419 F.3d at 1181. Mr. Valderrama fails to point to any fact that would have prevented Sergeant Smith from seeing him throw away the pipe as she exited her vehicle.

Second, Mr. Valderrama relies on Timothy Burney's testimony that he never saw Mr. Valderrama throw anything out of Mr. Garcia's car. But the fact

11

that Mr. Burney did not see Mr. Valderrama throw anything has no bearing on whether Sergeant Smith could have seen Mr. Valderrama throw the crack pipe, especially considering that Mr. Burney and Sergeant Smith were observing the events from different vantage points and that Mr. Valderrama admits he threw the pipe.

Third, Mr. Valderrama argues that the transcript of the officers' radio communications shows that Sergeant Smith did not see Mr. Valderrama throw the crack pipe. Mr. Valderrama points out that Sergeant Smith never radioed the other officers to report seeing Mr. Valderrama throw the pipe. This argument rests on speculation, unsupported by evidence, that if Sergeant Smith had seen Mr. Valderrama throw a crack pipe, she immediately would have reported the incident over the radio to the other officers. Sergeant Smith's failure to narrate over the radio what she was observing does not undermine her unequivocal testimony that she saw Mr. Valderrama throw the crack pipe.

Mr. Valderrama also urges that, when the shooting occurred, Sergeant Smith was communicating on her radio about another incident. Mr. Valderrama assumes that Sergeant Smith could not have been speaking on her radio and observing Mr. Valderrama throw the crack pipe at the same time. But the evidence shows that officers could use their radios when they were outside their vehicles, meaning that Sergeant Smith could have been speaking on her radio while observing Mr.

12

Valderrama throw the crack pipe. Mr. Valderrama again relies solely on speculation unsupported by evidence, which does not give rise to a disputed issue of fact.

Fourth, Mr. Valderrama argues that Detective Rousseau's statements show Sergeant Smith did not see Mr. Valderrama throw the crack pipe. When Detective Rousseau made a proffer for purposes of the police investigation of the shooting, he did not mention that Sergeant Smith saw Mr. Valderrama throw a crack pipe. But Detective Rousseau's proffer concerned what he observed during the traffic stop, not what Sergeant Smith observed. Thus, his statement does not create a genuine dispute of fact about whether Sergeant Smith saw Mr. Valderrama throw the pipe.

Shortly after the shooting, Detective Rousseau discussed the entire incident with Sergeant Malgor, his supervisor, and told him that Sergeant Smith was moving her car when he confronted Messrs. Valderrama and Garcia. Standing alone, this testimony could create a disputed issue of material fact about whether Sergeant Smith saw Mr. Valderrama throw the pipe. But we may not credit this testimony at summary judgment because it conflicts with Mr. Valderrama's own admission, made under oath, that Sergeant Smith was exiting her car when he threw the crack pipe. We are required to credit Mr. Valderrama's version of the facts, even if other evidence in the record is more favorable to him:

13

> When the nonmovant has testified to events, we do not (as urged by Plaintiffs' counsel) pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant. Instead, when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version. Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided.

*Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (*en banc*) (footnote omitted); *see also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1295-96 (11th Cir. 2012) (explaining that documentary evidence "contrary to [the plaintiff's] own deposition testimony" may not be considered at summary judgment).

For these reasons, all three officers are entitled to qualified immunity and summary judgment on Mr. Valderrama's § 1983 claims that the officers violated his Fourth Amendment rights when they performed an unlawful arrest.[6]  Mr. Valderrama has failed to establish that a reasonable jury could find Sergeant Smith did not have probable cause to arrest him, and her knowledge is imputed to the other officers.  *See Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) (*en banc*) ("Probable cause to arrest exists when the facts and circumstances within the

---

[6] The officers are also entitled to summary judgment on Mr. Valderrama's corollary state law claims alleging that the officers lacked probable cause to arrest Mr. Valderrama. *See Miami-Dade Cnty. v. Asad*, 78 So. 3d 660, 669 (Fla Dist. Ct. App. 2012).

14

collective knowledge of law enforcement officers . . . would cause a prudent person to believe that the suspect has committed or is committing an offense.").

B. Mr. Valderrama's § 1983 Claims Based on Deliberate Indifference

We now turn to Mr. Valderrama's deliberate indifference claims. The district court denied the officers qualified immunity from Mr. Valderrama's § 1983 claims alleging the officers were deliberately indifferent to his serious medical need in violation of the Fourteenth Amendment. The court held it was clearly established under our precedent that an arrestee has a right to immediate emergency care when he sustains an obvious life-threatening injury. The court also concluded that a reasonable jury could find that the officers violated that right when they delayed seeking medical care and reported Mr. Valderrama's injury as a laceration rather than a gunshot wound. We affirm in part and reverse in part.

1. Mr. Valderrama Has Shown that Detective Rousseau and Sergeant Smith Acted with Deliberate Indifference, But He Has Failed to Show that Sergeant Gonzalez Acted with Deliberate Indifference.

We must begin by considering whether Mr. Valderrama has shown that the officers acted with deliberate indifference and thus violated his constitutional rights. We hold that a reasonable jury could find that Sergeant Smith and Detective Rousseau were deliberately indifferent to Mr. Valderrama's serious medical need, but not Sergeant Gonzalez.

15

The Due Process Clause of the Fourteenth Amendment requires government officials to provide medical care to individuals who have been injured during apprehension by the police. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). To prevail on a § 1983 claim alleging a violation of that right, a plaintiff "must satisfy both an objective and a subjective inquiry." *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (internal quotation marks omitted).

A plaintiff must first establish the existence of an objectively serious medical need. *Id.* Here, neither side disputes that a gunshot wound presents an objectively serious medical need. As to the subjective inquiry, the plaintiff must prove that the officers were deliberately indifferent to his serious medical need. *Id.* More specifically, the plaintiff must present, for each officer, evidence from which a reasonable jury could conclude that (1) the officer was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, (2) the officer actually drew that inference, (3) the officer disregarded the risk of serious harm, and (4) the officer's conduct amounted to more than gross negligence. *Id.* Even when medical care ultimately is provided, the officer might still act with deliberate indifference "by delaying the treatment of serious medical needs . . . though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). As this Court has explained, the

16

"[d]eliberate indifference to a prisoner's serious medical needs violates the eighth amendment because denying or delaying medical treatment is tantamount to 'unnecessary and wanton infliction of pain.'" *Brown v. Hughes*, 894 F.2d 1533, 1537-38 (11th Cir. 1990) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)). In other words, Mr. Valderrama does not necessarily need to show that the delay in medical care exacerbated his condition because the delay in care is, itself, a wanton infliction of pain and a constitutional violation.

Mr. Valderrama has presented evidence satisfying the first two prongs of the deliberate indifference test because the evidence shows that each officer knew Mr. Valderrama had suffered a gunshot wound. Detective Rousseau admits he knew immediately that he had shot Mr. Valderrama. Sergeant Smith heard the gunshot and asked Detective Rousseau if he had fired his gun. When she approached Mr. Valderrama, she saw blood in his groin area and exclaimed, "Oh, my God!" Valderrama Decl. ¶ 50. Similarly, upon arriving at the scene, Sergeant Gonzalez understood Mr. Valderrama had been shot: he saw that Mr. Valderrama was bleeding, and Mr. Valderrama told Sergeant Gonzalez that he had been shot. Because the risks associated with a gunshot wound are obvious, the evidence that each officer knew Mr. Valderrama had been shot is sufficient to establish that each officer had subjective knowledge of the substantial risk of serious harm to Mr. Valderrama. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (explaining that

17

knowledge of the risk of serious harm may be established by "inference[s] from circumstantial evidence" or "from the very fact that the risk was obvious").

The core disputes surrounding Mr. Valderrama's deliberate indifference claims are (1) whether each officer disregarded the risk and (2) whether each officer's conduct constituted more than gross negligence.  As we explain in greater detail below, Mr. Valderrama has presented evidence that both Detective Rousseau and Sergeant Smith disregarded the risk of harm to Mr. Valderrama and that their conduct amounted to more than gross negligence, but Mr. Valderrama has not presented such evidence as to Sergeant Gonzalez.

a.  Sergeant Smith and Detective Rousseau

We conclude there is evidence from which a reasonable jury could find that Sergeant Smith and Detective Rousseau disregarded the risk of serious harm the gunshot wound presented.  Mr. Valderrama's gunshot wound was plainly a life-threatening injury,[7] and a reasonable jury could conclude that the officers purposefully delayed seeking medical assistance for him.  Detective Rousseau admits that, instead of immediately calling an ambulance for Mr. Valderrama, he

---

[7] The evidence amply supports an inference that Mr. Valderrama faced life-threatening injuries.  He suffered a close range gunshot wound; the bullet penetrated his penis, scrotum, testicle, and thigh before it exited just below his buttock.  As a result of this injury, Mr. Valderrama bled profusely through his clothing.  Mr. Valderrama also testified, "I thought I was going to . . . die."  Valderrama Decl. ¶ 66. Additionally, Miami Fire Rescue procedures assign gunshot wounds and heart attacks the highest priority level for emergency response.  Similarly, Miami-Dade County Police Department protocol requires that officer-involved shootings be reported immediately to dispatch.  A reasonable jury could infer that these procedures and protocols exist because gunshot wounds are life-threatening injuries.

18

and Sergeant Smith stopped to talk about the shooting and Mr. Valderrama's injuries. In addition, Mr. Valderrama testified that he observed Detective Rousseau and Sergeant Smith have a discussion. Mr. Valderrama begged Sergeant Smith to call him an ambulance, but Sergeant Smith told him to sit down. Significantly, neither Sergeant Smith nor Detective Rousseau has provided any explanation supported by the record why three and a half minutes passed before Sergeant Smith called an ambulance.[8]

Similarly, the evidence shows that Sergeant Smith falsely reported Mr. Valderrama's gunshot wound as a laceration. There obviously exists a vast difference in the severity of, and the care required to treat, a laceration, which could be merely a cut, and a gunshot wound, which is usually a serious, potentially life-threatening injury. Recognizing the importance of shooting victims receiving immediate care, Miami-Dade County Police Department protocol requires that shootings by officers be reported to dispatch immediately. Sergeant Smith violated this protocol when she lied about the nature of Mr. Valderrama's injuries.[9] In

---

[8] The officers contend the delay was caused by Mr. Valderrama's refusal to open the car door for Sergeant Smith after she ordered him to exit the vehicle. Although Mr. Valderrama was unable to open the car door after being shot in the genitals, Sergeant Smith opened the door for him without any trouble. A reasonable jury could conclude that, at most, Mr. Valderrama's failure to open the door caused a momentary delay.

[9] The fact that Sergeant Smith failed to report Mr. Valderrama's injuries as a gunshot wound in violation of department protocol further supports an inference that Sergeant Smith's misrepresentation was intentional. In addition, a reasonable jury could find that Sergeant Smith intentionally misrepresented the nature of Mr. Valderrama's injuries from the record evidence that she made inconsistent statements under oath about other facts related to calling for medical

19

contrast, the other two officers testified that they would have reported Mr. Valderrama's injuries as a gunshot wound with a bleeding victim.

Record evidence shows that by reporting the injury as a laceration instead of a gunshot wound, Sergeant Smith delayed the ambulance's arrival by approximately seven minutes. Fire and rescue dispatch categorizes calls as Alpha, Bravo, Charlie, or Delta, with Alpha being the lowest priority and Delta being the highest. If Sergeant Smith had reported Mr. Valderrama's injuries as a gunshot wound, dispatch would have categorized the call as Delta priority, and an ambulance would have arrived within four minutes of the call. Because Sergeant Smith reported the injuries as only a laceration, however, fire and rescue dispatch assigned the call the lowest priority level (Alpha), and the ambulance did not arrive until eleven minutes later.

Based on the evidence, a jury could infer that Detective Rousseau and Sergeant Smith spoke about the shooting before calling for assistance and that they discussed the need to concoct a story that would justify Detective Rousseau's use of deadly force and, therefore, complicitly delayed reporting and misreported Mr. Valderrama's injuries in order to delay the arrival of emergency personnel on the scene. Contrary to the dissent's contention, ample evidence supports this

care for Mr. Valderrama, including her testimony that she called in his injuries as soon as she realized that Mr. Valderrama was bleeding and that she did not realize he was shot until after she called for assistance.

20

inference.  As described above, Detective Rousseau admitted that he spoke with

Sergeant Smith and Mr. Valderrama's testimony shows that he observed the two

officers speak.  Moreover, the officers' subsequent actions, including Detective

Rousseau searching Mr. Garcia's car in violation of department policy, his offering

to drop the cocaine-possession charge against Mr. Burney to secure his

cooperation, Sergeant Smith reporting Mr. Valderrama's injuries as a laceration,

and her making inconsistent statements under oath, support an inference that their

conversation concerned the need to concoct a story that would justify Detective

Rousseau's use of deadly force.[10]

A jury could find that Detective Rousseau used this delay in medical care to

come up with a story to justify his use of force against Mr. Valderrama.  Under

department protocol, after the shooting Detective Rousseau should have

sequestered himself from the scene.  Instead, during the delay, Detective Rousseau

searched Mr. Garcia's car.[11]  His search did not turn up a firearm, only an old car

---

[10] Detective Rousseau, not Sergeant Smith, was the shooter.  Because Sergeant Smith did not shoot Mr. Valderrama but made the report to dispatch that delayed medical care, a jury could infer that she delayed the arrival of emergency personnel only after speaking with Detective Rousseau about the need to do so.

[11] This is not the only evidence that the officers failed to follow the department protocol that required Detective Rousseau to isolate himself.  Detective Rousseau admits that he spoke with Sergeant Malgor, his supervisor, before the homicide detectives arrived.  Cell phone records further show that Detective Rousseau and Sergeant Smith spoke on the phone before homicide detectives arrived and that Detective Rousseau continued to talk with Sergeants Gonzalez, Malgor, and Smith throughout the day.  Specifically, Sergeant Gonzalez wrote in the arrest report that before the traffic stop, a pedestrian approached Mr. Garcia's vehicle and handed Mr. Valderrama a metallic object that appeared to be a firearm.  This information could only have

21

radio sitting on the car's backseat.  Detective Rousseau now claims he was justified in using deadly force because, during the traffic stop, Mr. Valderrama was holding a metallic object under the front passenger seat that appeared to be a firearm but was actually the radio.[12]  The record contradicts Detective Rousseau's story:  the radio was found resting on the backseat of the car, not in the front passenger compartment, and the police fingerprint investigation revealed that Mr. Valderrama had not touched the radio.  There is still other evidence that Detective Rousseau sought to fabricate evidence about the shooting during the delay:  Mr. Burney testified that Detective Rousseau offered to reduce the charges against Mr. Burney if he would lie and say he saw a passenger hand Mr. Valderrama a metallic object that appeared to be a firearm.

Based on this record, a jury could find that Detective Rousseau and Sergeant Smith discussed Mr. Valderrama's injuries before calling for medical care.  It could infer that during this conversation, the officers implicitly or explicitly agreed to delay the arrival of medical care:  Sergeant Smith reported Mr. Valderrama's injury as a laceration rather than a gunshot wound and, though she requested an

_____

come from Detective Rousseau.  At summary judgment, Sergeant Gonzalez submitted a sworn declaration that he learned this information from Detective Rousseau's proffer to the homicide detectives who were investigating the shooting.  But his declaration directly contradicts his earlier deposition testimony that he never reviewed Detective Rousseau's proffer and did not even know whether Detective Rousseau had made a proffer.

[12] In contrast, Mr. Valderrama testified that his hands were on his knees or against his stomach, not hidden, during the traffic stop; he never reached under the seat; and he was not holding a metallic object.

22

ambulance "on the three," record evidence suggests that an ambulance would have arrived seven minutes earlier had she reported the injury as a gunshot wound. Because he was the shooter, Detective Rousseau would be the beneficiary of any such delay, and he in fact used the delay to search the car in violation of department protocol. As a result, a jury could find that each officer disregarded a serious risk of harm to Mr. Valderrama.

The officers argue that because Sergeant Smith directed police dispatch to send the ambulance "on the three," which they contend is the same as requesting the fastest possible assistance, it did not matter that Sergeant Smith failed to report the gunshot wound. They blame police dispatch for any delay because, they claim, police dispatch failed to repeat the "on the three" direction to the fire and rescue dispatcher.

We disagree. Ample evidence undermines the officers' position on the meaning of "on the three," and a reasonable jury could conclude that Sergeant Smith did not request assistance as quickly as possible when she used that phrase. First, there is testimony supporting a different meaning of "on the three": that the rescue vehicle will use "lights and sirens" (that is, it will not stop for traffic signals) when traveling to the scene of the incident. Deposition of Earl Pope at 11. And the record contains an example of an "on the three call" receiving only a Bravo priority designation. This evidence negates the officers' claim that

23

requesting assistance "on the three" was the functional equivalent of reporting a gunshot wound, in which case the call for assistance would be dispatched with the highest priority.  Second, there is also evidence in the record from which the jury could find that the police dispatcher in fact told fire and rescue dispatch to send assistance "on the three . . . laceration" [13]  *See* Dkt. No. 107 (CD labelled Miami Fire and Rescue Audio, file ICity2, at 0:03-05).  If the fire and rescue dispatcher was told that the request was "on the three," but it still took the ambulance eleven minutes to arrive, then this evidence tends to refute the officers' argument that a request for assistance "on the three" seeks the fastest possible response.  We conclude that Mr. Valderrama has come forward with evidence from which a reasonable jury could find that Detective Rousseau and Sergeant Smith disregarded the substantial risk of serious harm to Mr. Valderrama.

Considering the fourth prong of the subjective inquiry of the deliberate indifference test, a reasonable jury could conclude that Sergeant Smith's and Detective Rousseau's conduct was more than grossly negligent.  As we discussed above, despite the fact that a gunshot wound to the groin is a life-threatening injury, the officers inexplicably waited three and a half minutes before Sergeant Smith called an ambulance.  Then, Sergeant Smith concealed the severity of the

---

[13] The record evidence includes a recording of the police dispatch communications with fire and rescue dispatch, as well as a partial transcript of the recording.  An untranscribed portion of one of these recordings clearly includes a request to fire and rescue dispatch for assistance "on the three. . . laceration."

24

gunshot wound when she reported it as a laceration, further delaying the arrival of the ambulance by up to seven more minutes. The jury could infer Detective Rousseau's deliberate indifference regarding the seven-minute delay by virtue of the facts that (1) the delay served to benefit him and (2) he, in fact, took advantage of the delay both by searching the car and attempting to alter Mr. Burney's testimony about the shooting.[14] While a three and half minute delay standing alone may be insufficient to establish deliberate indifference, under the facts of this case, a reasonable jury could conclude that Sergeant Smith and Detective Rousseau were more than grossly negligent when they delayed Mr. Valderrama's medical care for more than ten minutes for no good or legitimate reason as he faced life-threatening injuries. *See Bozeman*, 422 F.3d at 1273 (explaining that for life-threatening injuries a delay "is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes"); *McElligott*, 182 F.3d at 1255 ("[T]he reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable."). After considering all the evidence, we conclude that Mr. Valderrama has met his burden to demonstrate that the conduct of Detective Rousseau and Sergeant Smith was more than grossly negligent.

---

[14] Even if an inference is not necessarily the most plausible, at this stage of the litigation we must take not only the facts but also the inferences that we draw from those facts in the light most favorable to the nonmoving party below. *See Tolan v. Cotton*, __ U.S. __, 134 S. Ct. 1861, 1868 (2014) (per curiam).

b.    Sergeant Gonzalez

Now, we must consider whether Mr. Valderrama has come forward with evidence showing that Sergeant Gonzalez disregarded Mr. Valderrama's serious medical need and was more than grossly negligent. The evidence Mr. Valderrama has put forth as to Sergeant Gonzalez on both issues is much weaker than his evidence as to the other officers. First, as to whether Sergeant Gonzalez disregarded a risk of serious harm to Mr. Valderrama, the evidence shows that Sergeant Gonzalez was not present when the shooting occurred and arrived on the scene approximately one minute before Sergeant Smith called to request an ambulance. Upon arriving, Sergeant Gonzalez called Sergeant Malgor to report the shooting instead of seeking medical care for Mr. Valderrama, but there is no evidence that Sergeant Gonzalez was aware that Detective Rousseau and Sergeant Smith had violated department protocol by not yet calling dispatch. There is also no evidence tying Sergeant Gonzalez to the seven minute delay caused by Sergeant Smith's reporting Mr. Valderrama's gunshot wound as a laceration.

Mr. Valderrama urges that Sergeant Gonzalez's own admission shows he disregarded the risk by failing to secure medical care during the nearly ten minute wait for an ambulance. Sergeant Gonzalez testified that it is improper to allow a shooting victim to wait longer than ten minutes for an ambulance: "I would have been on the horn calling for rescue. I will not let a shooting victim sit there for ten

minutes.  I would have just thrown him in my car and driven to [the hospital]." Deposition of Braulio Gonzalez at 104.  We need not decide whether this statement is sufficient to give rise to an inference that Sergeant Gonzalez disregarded the risk of serious harm to Mr. Valderrama because we conclude that Mr. Valderrama has failed to present evidence from which a reasonable jury could conclude that Sergeant Gonzalez's conduct was more than grossly negligent.

As we explained above, Sergeant Gonzalez was not on the scene when the officers initially delayed seeking medical assistance for Mr. Valderrama, and there is no evidence that Sergeant Gonzalez was aware that Detective Rousseau and Sergeant Smith had violated department policy and failed to report immediately the gunshot wound.  Similarly, there is no evidence that Sergeant Gonzalez knew Sergeant Smith had lied about Mr. Valderrama's injuries or that she had caused a delay in medical care.[15]  In the absence of any such evidence, we cannot conclude that Mr. Valderrama has met his burden to show that Sergeant Gonzalez's conduct was at least grossly negligent.  We therefore reverse the district court and hold that Sergeant Gonzalez is entitled to summary judgment based on qualified immunity from Mr. Valderrama's deliberate indifference claim.

---

[15] While there is evidence that Sergeant Gonzalez spoke with Detective Rousseau after the shooting in violation of department policy requiring Detective Rousseau to be sequestered, such evidence does not show Sergeant Gonzalez was aware that Detective Rousseau and Sergeant Smith had delayed medical care.

2. The Law Was Clearly Established that Detective Rousseau and Sergeant Smith's Conduct Constituted Deliberate Indifference.

We next address whether the constitutional right that Detective Rousseau and Sergeant Smith violated was clearly established on the date of the incident so that it would have been reasonably clear to an officer that Sergeant Smith's and Detective Rousseau's conduct was unlawful. We conclude that it was. As we previously have explained, it is "clearly established . . . that an official acts with deliberate indifference when he intentionally delays providing . . . access to medical treatment, knowing that the [arrestee] has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." *Lancaster v. Monroe Cnty., Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997).[16] Under this authority, it was clearly established that when officers intentionally delay seeking treatment for a life-threatening injury, they act with deliberate indifference.

Nonetheless, the officers argue that this general statement alone is insufficient to establish that they acted with deliberate indifference given the specific facts of this case. Even accepting the officers' argument that more specificity is required, however, it was still clearly established that the officers acted with deliberate indifference here. Though we recognize that there is no case "on all fours" with the facts before us, this is a case in which the principles from

---

[16] Although *Lancaster* involved an inmate, not an arrestee, "decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees." *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996).

28

relevant precedents were clear enough that the officers had notice. *See Holloman*, 370 F.3d at 1277 (internal quotation marks omitted). We have warned that delays even of only a "few minutes" in seeking care for life-threatening injuries can constitute deliberate indifference. *Bozeman*, 422 F.3d at 1273; *see also Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (explaining that with serious and painful injuries, "it may be that deliberately indifferent delay, no matter how brief, would render defendants liable as if they had inflicted the pain themselves"). These prior cases provided Sergeant Smith and Detective Rousseau with a "reasonable warning that the conduct at issue violated constitutional rights." *Holloman*, 370 F.3d at 1277 (internal quotation marks omitted).

In support of their position that the constitutional violation was not clearly established, the officers cite our statement from *Pourmoghani-Esfahani v. Gee* that it was not "clearly established that an approximately two-to-five minute delay of medical care . . . is a constitutional violation, especially with facts like this case." 625 F.3d 1313, 1318 (11th Cir. 2010). In *Gee*, a pretrial detainee claimed an official acted with deliberate indifference where the detainee suffered minor injuries (a nosebleed, contusion to the forehead, and a facial abrasion), and the official promptly sought medical care that arrived within two to five minutes. *Id.* at 1316-17. Although the detainee ultimately was transferred to a hospital, the officials did not have any subjective knowledge that the detainee had serious

29

injuries requiring immediate care. *Id.* at 1318. After concluding the plaintiff had not established a constitutional violation, which alone was sufficient to conclude that the officers were entitled to summary judgment, we explained in the alternative that the law was not clearly established. *Id.* at 1318-19.

In *Gee* we recognized that a brief delay in the treatment of apparently mild injuries does not constitute deliberate indifference. *See Gee*, 625 F.3d at 1318. The facts of this case are fundamentally different from the facts in *Gee*. Here, there is evidence that Mr. Valderrama's injuries were life-threatening, that Detective Rousseau and Sergeant Smith subjectively knew that he needed medical treatment, and that the delay at issue was two to five times longer than the delay in *Gee*. Given these differences, *Gee* does not control or foreclose us from concluding it was clearly established that Sergeant Smith and Detective Rousseau acted with deliberate indifference.

Additionally, were the jury to find that Sergeant Smith delayed seeking care and lied about Mr. Valderrama's injuries so that she and Detective Rousseau could craft a story to justify the shooting, then our prior case law clearly establishes that delay caused for this reason constitutes deliberate indifference. We have explained that when officials "ignore without explanation a[n arrestee's] serious condition that is known or obvious to them, the trier of fact may infer deliberate indifference." *Brown*, 894 F.2d at 1538. Here, the officers did more than "ignore

30

without explanation" a serious medical need—they acted with apparent self-interest, and one lied about the nature of Mr. Valderrama's life-threatening injuries. Any reasonable officer in the same circumstances and possessing the same knowledge would have known that police officers cannot seek to protect themselves from the potential legal and professional ramifications of injuries inflicted by one of the officers while an arrestee bleeds through his clothing from a gunshot wound. *Cf. Kingsland v. City of Miami*, 382 F.3d 1220, 1233-34 (11th Cir. 2004) (holding it was clearly established law that officers violated an arrestee's constitutional rights when they acted to protect their own self-interest and fabricated evidence to establish they had probable cause to arrest).

In conclusion, Mr. Valderrama has presented facts from which a jury could find that Sergeant Smith and Detective Rousseau acted with deliberate indifference. Moreover, it is clearly established law that the officers' conduct constituted deliberate indifference. We thus agree with the district court that Sergeant Smith and Detective Rousseau are not entitled to qualified immunity from Mr. Valderrama's deliberate indifference claims and affirm the district court's decision.

## IV.    CONCLUSION

For the reasons explained above, we reverse in part and affirm in part the district court's summary judgment order, and we dismiss in part the portion of the

appeal over which we have no jurisdiction.  With regard to Sergeant Gonzalez, we reverse the district court's denial of summary judgment on the § 1983 claims and the state law claim for false arrest.  As to Sergeant Smith and Detective Rousseau, we reverse the district court's denial of summary judgment on the § 1983 claim for violations of Mr. Valderrama's Fourth Amendment rights and the state law claim for false arrest; however, we affirm the denial of summary judgment on the § 1983 claim for violation of Mr. Valderrama's Fourteenth Amendment rights based on deliberate indifference to his serious medical need.  Finally, we dismiss the portion of the appeal related to Mr. Valderrama's state law conspiracy and concert of action claims for lack of appellate jurisdiction.

**AFFIRMED IN PART, REVERSED IN PART, DISMISSED IN PART, AND REMANDED.**

COX, Circuit Judge, concurring in part and dissenting in part:

I do not join the court's opinion because I disagree with its statement of the facts. I concur in the court's holding that Detective Carl Rousseau, Sergeant Yasmina Smith, and Sergeant Braulio Gonzalez are entitled to qualified immunity on Roberto Valderrama's 42 U.S.C. § 1983 false arrest claim. I concur in the court's holding that Rousseau, Smith, and Gonzalez are entitled to state-law immunity on Valderrama's false arrest claim under Florida law. I concur in the court's holding that Gonzalez is entitled to qualified immunity on Valderrama's Section 1983 deliberate indifference claim against him.

I dissent from the court's holding that Rousseau and Smith are not entitled to qualified immunity on Valderrama's Section 1983 deliberate indifference claim against them. I dissent because the court's holding on this claim is based on speculation that the record does not support.

## I.    The Undisputed Facts Derived from Record Evidence

The court ignores undisputed facts that rend its speculative weave. One is the transcript of transmissions between Smith and the dispatcher. Rousseau shot Valderrama at 6:30:42. (Op. at 4). Here is the entire transcript of the conversation between Smith and the dispatcher:

- 06:34:18—Smith calls police dispatch on the headquarters line. She says, "Can I have a rescue at NW 12th Street and NW 2nd Avenue reference, ahh, a laceration."

- 06:34:23—the dispatcher answers, "NW 2 Avenue . . . What the street?"

- 06:34:28—Smith answers, "12 Street and 2 Avenue."

- 06:34:33—the dispatcher says, "Okay so NW 12 Street on 2 Avenue. *Do you want a routine*?"

- 06:34:39—Smith responds, "No, *on the three*."[1]

- 06:45:00 (ten minutes, eleven seconds after her last communication with dispatch ended)—Smith radios back and says, "Can you tell me ETA please. *Subject is bleeding*." The dispatcher answered 2 seconds later: *"Yes, well they didn't answer on the police emergency at the desk. I had to call them on the phone.* I'll see if I can get an ETA."

(DE93-19:2) (emphasis added). Fifty-three seconds after the dispatcher gave this answer (fifteen minutes, thirteen seconds after the shooting), Miami Fire-Rescue arrived. Also undisputed is that five of the fifteen minutes that passed between Smith's first call to dispatch and Miami Fire-Rescue's arrival was due to the dispatcher's inability to hail Miami Fire-Rescue. *See* DE93-15:1 (Miami Fire-Rescue Patient Care Report–unit dispatched at 6:39).

None of these undisputed facts support the court's speculation that Rousseau and Smith took the three minute and thirty-three second "delay" between the gunshot and the call to "concoct" a way for Rousseau to cover up his conduct. The following section highlights the court's unwarranted inferences.

---

[1] From beginning to end, this exchange took 21 seconds.

34

## II.    The Court's Holding and Its Basis

The court's holding is that "a reasonable jury could find that Sergeant Smith and Detective Rousseau were deliberately indifferent to Mr. Valderrama's serious medical need . . . ." (Op. at 15). The court supports this conclusion with several inferences that are unreasonable because they are not supported by facts in the record. These include that Rousseau and Smith "spoke about the shooting before calling for assistance and . . . discussed the need to concoct a story that would justify Detective Rousseau's use of deadly force" and that Smith "delayed reporting and misreported Mr. Valderrama's injuries in order to delay the arrival of emergency personnel on the scene." (Op. at 20). *See also id.* at 21 ("[T]he officers' subsequent actions, including . . . Sergeant Smith reporting Mr. Valderrama's injuries as a laceration . . . support an inference that their conversation concerned the need to concoct a story that would justify Detective Rousseau's of deadly force."); *id.* at 22 ("Based on this record, a jury could find that Detective Rousseau and Sergeant Smith discussed Mr. Valderrama's injuries before calling for medical care . . . [and] that during this conversation, the officers implicitly or explicitly agreed to delay the arrival of medical care.")

The dispatch transcript offers no basis upon which to pin any wrongdoing upon Smith except that she first reported the injury as a "laceration" rather than as a "gunshot wound." But, the fact that she asked for an "on the three" response,

35

rather than a "routine" response, cuts against any inference that her "laceration" report was part of an effort to delay the arrival of medical personnel. Also, and as previously noted, the first five minutes of the delay cannot be attributed to Smith. When she called the dispatcher back, she learned that the dispatcher had been unable to reach Miami Fire-Rescue.

Valderramma's Fourth Amended Complaint devotes forty-four paragraphs to the alleged effort of the police to cover for Rousseau. Not one word in those paragraphs suggests that a conversation between Rousseau and Smith of the kind described in the court's opinion even occurred. Neither Valderrama's summary judgment papers, the district court's summary judgment opinion, nor Valderrama's brief to this court paints that picture.[2] All that can be derived from record evidence is that Rousseau told Smith he had shot Valderrama and that Valderrama saw them talking. Any inference as to what Rousseau and Smith said to one another during that "discussion" has been supplied entirely by the court's opinion in its effort to dress a deliberate indifference claim from fabric that the record does not provide.

---

[2] I note that the duration of the cover-up alleged in Valderrama's Fourth Amended Complaint, his summary judgment papers, and his brief to this court is much longer than three minutes, thirty-three seconds. The court, however, focuses only on that brief window about which the record reveals nothing of any substance.

### III.    *Brown v. Hughes*

The court relies heavily on *Brown v. Hughes*, 894 F.2d 1533 (11th Cir. 1990), for the proposition that *any* delay in providing medical care for serious medical needs is unconstitutional.  That case involved an inmate who suffered a broken foot in a jail-cell fight.  Jailers waited six hours to take him to the hospital, by which time his foot was so swollen that doctors had to wait eleven days to put a cast on it.  *Brown* cites several of our older cases for the proposition that "[w]hen prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference."  894 F.2d at 1538 (citations omitted).

Neither the statement that "[any] delay, no matter how brief," *id.*, nor the statement quoted at the end of the preceding paragraph, was necessary to a holding regarding a six-hour delay in tending to a broken foot that resulted in swelling of such magnitude that eleven days had to pass before a cast could be put on.  *Brown* is clearly distinguishable on its facts.  First, the delay in *Brown* was six hours; the delay here was fifteen minutes.  Second, the medical condition of the inmate in *Brown* worsened because of the delay.  When Miami Fire-Rescue arrived fifteen minutes after Rousseau shot Valderrama, Valderrama was alert, conscious, responsive, had stable vital signs, and had a "hemorrhage-not dangerous" with "no signs of distress." (DE93-15 [Miami Fire-Rescue Patient Care Report]).

37

## IV.    Conclusion

The court's opinion that Rousseau and Smith intentionally delayed medical care for Valderrama so Rousseau could fabricate his own story is of the court's own making.  I dissent.  I would reverse the district court's denial of qualified immunity in favor of Rousseau and Smith because the record does not support the conclusion that Rousseau and Smith were deliberately indifferent to Valderrama's serious medical needs.