[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-12871
Non-Argument Calendar

_____

D.C. Docket No. 1:12-cv-01047-MHT-TFM


COURTNEY MCBRIDE,

Plaintiff - Appellee,

versus

HOUSTON COUNTY HEALTH CARE AUTHORITY,
d.b.a. Southeast Alabama Medical Center, et al.,

Defendants,

MAMIE MCCORY,
STEPHANIE JOHNSON,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(September 30, 2016)

Before JORDAN, JULIE CARNES and JILL PRYOR, Circuit Judges.

PER CURIAM:

While detained in the City of Dothan Jail, Courtney D. McBride developed a painful, deteriorating skin condition. She contends that for more than four days, she was unable to eat or drink and her skin turned ashy, developed black splotches, and began to peel off. According to McBride, this condition, which led to a potentially lethal rash requiring treatment in the intensive care unit of a hospital, amounted to a serious medical need. She sued, among other defendants, two jail officers, Stephanie Johnson and Mamie McCory (the "officers"), alleging civil rights violations under 42 U.S.C. § 1983. Specifically, she alleged that the officers were deliberately indifferent to her serious medical need in violation of the Fourteenth Amendment to the United States Constitution. The officers moved for summary judgment on qualified immunity grounds. Viewing the evidence in the light most favorable to McBride, the district court held that the officers were not entitled to qualified immunity. This interlocutory appeal followed.

Upon careful review, we affirm in part, reverse in part, and remand for further proceedings. McBride has amassed sufficient evidence to overcome Johnson's assertion of qualified immunity, but the record does not support a finding that McCory was aware of McBride's serious medical need. Thus,

2

McBride cannot show that McCory violated a clearly established constitutional right, and McCory is entitled to qualified immunity.

## I.  BACKGROUND

We view the evidence and derive factual inferences therefrom in the light most favorable to McBride as the non-movant on summary judgment.  *See Perez v. Suszczynski*, 809 F.3d 1213, 1216 (11th Cir. 2016).  So viewed, the record supports the following facts.

On June 21, 2012, a municipal court ordered McBride to jail pending a domestic violence charge.  While still in the courtroom, McBride suffered a psychological breakdown and was transported to the behavioral unit of Southeast Alabama Medical Center ("SAMC"),[1] where she remained for two weeks.  There, Dr. Dinesh Karumanchi diagnosed McBride with, among other conditions, bipoloar disorder.  He prescribed one 25mg tablet of Lamictal (the brand name for lamotrigine) twice a day.  One of the potential side effects of Lamictal is a skin condition known as Stevens-Johnson Syndrome ("SJS"), which results in blisters covering up to 10% of the body.  If blisters continue to spread and cover 30% or more of the body, the potentially lethal condition is known as Toxic Epidermal Necrolysis ("TEN").  Dr. Karumanchi warned McBride about the possibility of a

---

[1] Southeast Alabama Medical Center is the trade name for Houston County Health Care Authority.

lethal rash associated with her treatment, but he instructed her not to stop taking the medication without first consulting a doctor.

On July 4, 2012, Dr. Karumanchi discharged McBride into police custody, and she was admitted into the jail. At the time of the discharge, Dr. Karumanchi verbally told the transferring officer, Arthur Schaefer, III, that if her condition worsened or she had "any problems," she should return to the hospital. Karumanchi Dep. Tr. at 133, Doc. 172-12.[2] Although Schaefer denied receiving such verbal instructions, he agreed that if the doctor had given him any verbal instructions, he would have relayed them to the jail supervisor. It was then standard operating procedure for the supervisor to share the doctor's verbal instructions with all jail staff who might interact with the detainee. McBride was placed on suicide watch and sent to a holding cell separate from the general population.

On her second day in the jail, McBride started to feel sick. Her symptoms began with chapped lips, a swollen face, and chills. By the next day, July 6, she had a sore throat and fever and generally felt very ill. On that day, the jail brought her to a prescheduled follow-up appointment at SAMC. McBride does not remember complaining to jail officers or SAMC staff about feeling sick or suffering a skin rash.

---

[2] Citations to "Doc." refer to docket entries in the district court record in this case.

4

McBride returned to the jail after her appointment.  From July 6 through July 10, her fever persisted and her condition worsened.  She began to develop black splotches on her skin.  She had a headache and a throat so sore that she had difficulty swallowing.  During those four days, she was unable to eat or drink, and she regularly complained about needing medical attention during "every shift to everybody that opened [the cell] door."  McBride Dep. Tr. at 506-507, Doc. 172-11.  When she could muster the energy, she also banged on the door and screamed for help.

On July 9, Correctional Officer Stephanie Johnson commented that McBride's lips "looked like they were peeling off."[3]  McBride Dep. Tr. at 504, Doc. 172-11.  Johnson knew that McBride had not been eating, and McBride told Johnson she was unable to drink as well.  In response, Johnson brought McBride Vaseline and ice water.  McBride asked to go to the hospital, but Johnson ignored this request in violation of jail policy, which required that officers send detainees to the doctor on the same day they request medical attention.

McCory, who was the jail administrator during this time, was in her office on July 5, 6, 9, and 10.  She confirmed that her office was about 20 feet from

---

[3] McBride stated that she got sick sometime between July 6 and July 9, and it was during that time that she interacted with Johnson.  McBride was unable to give a more precise date.  Johnson attested that during this period she worked only July 9 and 10, and McBride offered no evidence to the contrary.  The undisputed evidence thus supports the inference that the interaction between McBride and Johnson occurred on July 9.

5

McBride's holding cell, close enough to hear McBride if she yelled.  McCory maintained that she did not hear McBride screaming or calling from her cell at any time.  The record contains no evidence that McCory checked on McBride during this time; McCory explained that it was the other jail officers' responsibility to do that.  Until July 10, none of the jail personnel reported to McCory that McBride suffered any medical problems, lodged any medical complaints, or had requested any medical treatment.

On July 10, McBride complained of a sore throat and refused to eat breakfast or lunch.  In response, after lunch, the jail transported her again to SAMC.

At SAMC, McBride met with a nurse and complained of a headache and sore throat.  She also reported that she had not eaten or drunk any liquids in five days.  The nurse's notes show that McBride's "[g]eneral [a]ppearance" was "well" and she was "[i]n no distress."  Pl.'s Resp. Ex. G, Doc. 172-10 at 4.  But the notes further indicate that McBride had swollen tonsils, a 101.5 degree fever, and difficulty breathing.  The nurse also observed that McBride's eyes were "sunken" and she was "very weak and lethargic."  *Id.*  Finally, the nurse reported that McBride's skin was very dry [and] ashy" and her lips were "very dry [and] cracked" with moderate bleeding.  *Id.*  Although not reported in the nurse's notes, McBride also exhibited "little black splotches . . . all over [her] face."  McBride

6

Dep. at 223.  The nurse ran a lab test and confirmed that McBride had "Strep A." Pl.'s Resp. Ex. G, Doc. 172-10 at 3.

SAMC then sent McBride to the emergency room for further evaluation and hydration.  The emergency room diagnosed her with "[p]haryngitis," "[t]onsilitis," a "[c]anker sore," and a "rash" and prescribed antibiotics.  Def. Mot. Summ. J. Ex. A, Doc. 131-16 at 399.  The hospital discharged McBride.  She was released from the jail later that day, July 10.

McBride returned home and her symptoms continued to worsen that night and into the morning of July 11.  She had trouble urinating, her ears and head hurt, and she still had splotches on her skin.  She was in excruciating pain.  Her headache and fever persisted.  Her throat hurt, and she still could not eat or drink. Her lips, tongue, and vaginal area were swollen, and the skin on her lips was still peeling off.  She went to the emergency room.  The emergency room doctor who evaluated McBride diagnosed her with a fever blister and vaginitis.  The doctor did not observe a rash, reported no fever, and did not diagnose a serious medical condition.  McBride returned home.

By the next morning, July 12, the skin on McBride's ear was falling off. She returned to the emergency room, where the doctor observed a rash over 99% of her skin.  She was diagnosed with SJS, "most likely due to Lamictal."  Doc. 131-16 at 68.  The doctor ordered her to stop taking Lamictal and, after a few days,

7

she was transferred to the medical intensive care unit ("ICU") at the University of Alabama, Birmingham.  Once in the ICU, she was diagnosed with TEN, considered "critically ill" due to a significant loss of skin, which "was similar to a severe burn involving greater than 30 percent of the body surface area."  Doc. 172-16 at 20.  She was treated for nine days and then released.

McBride filed this lawsuit in the district court naming, among other defendants, McCory and Johnson.[4]  Relevant to this appeal, she alleged that McCory and Johnson acted with deliberate indifference to her serious medical need in violation of the Fourteenth Amendment.  McCory and Johnson filed a motion for summary judgment raising a qualified immunity defense.  The district court denied their motion, holding that a reasonable jury could conclude that McCory and Johnson violated McBride's clearly established constitutional right.  The officers timely filed this interlocutory appeal.  *See Scott v. Harris*, 550 U.S. 372, 376 n.2 (2007) ("[A]n order denying qualified immunity is immediately appealable even though it is interlocutory; otherwise, it would be effectively unreviewable." (internal quotation marks omitted)).

---

[4] All of the other defendants were dismissed before trial except Karumanchi and the City of Dothan.  McBride's claim against Karumanchi was tried before a jury in July 2015.  The jury found that Karumanchi had not breached the standard of care in his treatment of McBride, and the district court entered judgment in favor of Karumanchi pursuant to Federal Rule of Civil Procedure 54(b).  The only claim against the City to survive summary judgment is a state law negligence claim, which has not proceeded to trial because the court stayed this action as to the claims against the City, McCory, and Johnson pending this appeal.

8

## II.  STANDARD OF REVIEW

"On an interlocutory appeal from the denial of qualified immunity, this Court conducts a *de novo* review."  *Kjellsen v. Mills*, 517 F.3d 1232, 1236 (11th Cir. 2008).  As with any review of a summary judgment decision, "we view all evidence and factual inferences in the light most favorable to the non-moving party."  *Perez*, 809 F.3d at 1217.  "We must review the evidence in this manner because the issues appealed here concern not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of clearly established law."  *Id.* (internal quotation marks omitted).  Summary judgment should be granted when the record evidence shows there is no genuine dispute concerning any material fact and the movant is entitled to judgment as a matter of law.  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (citing Fed. R. Civ. P. 56(a)).

## III. ANALYSIS

The officers argue that the district court erred in denying their motion for summary judgment on qualified immunity grounds.  "Qualified immunity shields government officials acting within their discretionary authority from liability unless the officials violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Franklin v. Curry*, 738 F.3d 1246, 1249 (11th Cir. 2013) (internal quotation marks omitted).  The parties do not

9

dispute that McCory and Johnson were acting within their discretionary authority at all relevant times.  Thus, the burden shifts to McBride to show that "(1) the defendant[s] violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation."  *Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015) (internal quotation marks omitted).  We consider each element in turn.

## A.    Constitutional Violation: Deliberate Indifference under the Fourteenth Amendment

McBride contends that McCory and Johnson were deliberately indifferent to her serious medical needs in violation of her rights under the Fourteenth Amendment.  Pretrial detainees like McBride "plainly have a Fourteenth Amendment due process right to receive medical treatment for illness and injuries."  *Jackson v. West*, 787 F.3d 1345, 1352 (11th Cir. 2015) (internal quotation marks omitted).[5]  "To prevail on a § 1983 claim alleging a violation of that right, a plaintiff must satisfy both an objective and a subjective inquiry."  *Valderrama*, 780 F.3d at 1116 (internal quotation marks omitted).

As regards the objective inquiry, McBride must show that she suffered an objectively serious medical need.  *See id.*; *Farrow v. West*, 320 F.3d 1235, 1243

---

[5] The standard for deliberate indifference claims under the Fourteenth Amendment is the same as the standard applicable for prison inmates under the Eighth Amendment.  *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996).  Thus, "decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees."  *Id.*

(11th Cir. 2003).  "In our circuit, a serious medical need is considered one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Farrow*, 320 F.3d at 1243 (internal quotation marks omitted); *accord Goebert v. Lee Cty.* 510 F.3d 1312, 1327 (11th Cir. 2007).  Either way, the medical need must be "one that, if left unattended, pos[es] a substantial risk of serious harm."  *Farrow*, 320 F.3d at 1243 (alteration in original) (internal quotation marks omitted).

On this record, a jury could find that McBride suffered an objectively serious medical need while detained in the jail.  A person who is calling for help, in obvious pain; has a fever; is unable to eat or drink for days; and whose lips are blistered and "peeling off," objectively needs a doctor's attention.  *See, e.g.*, *id.* at 1243-44 (holding that the pain and weight loss from having virtually no teeth constituted a medical need warranting treatment).  Moreover, McBride ultimately was diagnosed with SJS, a painful skin condition that, when left untreated, led to its more severe form, TEN, that put her in critical condition with a rash over 99% of her body.  With these facts, a reasonable jury could infer that McBride suffered a serious, deteriorating medical need sometime between July 6 and July 9, while detained in the jail.

11

The officers argue that, because McBride was not diagnosed with SJS until about two days after her release from the jail, and because some medical professionals failed to diagnose it earlier, a reasonable jury could not conclude that McBride suffered a serious medical condition while detained. We disagree. A reasonable jury could conclude on this record that McBride suffered with SJS—a known side effect of her medication—on the days leading up to her diagnosis and that the medical professionals who overlooked her condition were themselves grossly negligent. *See Goebert*, 510 F.3d at 1327 (explaining that the fact that a pregnant inmate leaking amniotic fluid had been seen by medical staff did not mean that a layperson could not tell she suffered from a serious medical need because, as the inmate alleged, the medical staff themselves failed to attend to her needs). In any event, a diagnosis is unnecessary where, as here, the serious condition would be obvious even to lay persons. *See id.* In sum, McBride has presented a triable issue regarding whether she suffered an objectively serious medical need while she was detained in the jail.

We now turn to the subjective inquiry. To satisfy this inquiry, McBride "must prove that the officers were deliberately indifferent to [her] serious medical need." *Valderrama*, 780 F.3d at 1116.

> More specifically, the plaintiff must present, for each officer, evidence from which a reasonable jury could conclude that (1) the officer was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, (2) the officer actually drew

12

> that inference, (3) the officer disregarded the risk of serious harm, and (4) the officer's conduct amounted to more than gross negligence.

*Id.* An unreasonable delay in treatment may constitute unconstitutional deliberate indifference, whether or not it exacerbated the condition, if the delay results in "a wanton infliction of pain." *Id.* And when officials "ignore without explanation a[n arrestee's] serious condition that is known or obvious to them, the trier of fact may infer deliberate indifference." *Id.* (alteration in original) (internal quotation marks omitted); *accord Carswell v. Bay Cty.*, 854 F.2d 454, 457 (11th Cir. 1988) (holding that jail personnel who are aware of an inmate's need for medical care but fail to provide it act with deliberate indifference); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) (holding that a jailer who was aware of a serious medical problem but provided medical care "so cursory as to amount to no treatment at all . . . may violate the Fourteenth Amendment"). We apply this standard to McBride's claims against McCory and Johnson.

As regards McCory, the record contains insufficient evidence from which a reasonable jury could find that she was aware of McBride's serious medical need. There is no evidence that McCory ever saw McBride or communicated with her about McBride's medical condition. The uncontroverted evidence shows that none of the jail personnel who regularly checked on detainees reported to McCory that McBride suffered any medical problems or requested to go to the hospital. Even drawing the inference, as we must based on this record, that McCory heard

13

McBride screaming, there is no evidence to suggest that McCory actually was aware that McBride was screaming because of a medical need.  We readily conclude that on this record a reasonable jury could find that McCory acted negligently; as jail administrator, McCory should have personally checked on McCory, a screaming detainee on suicide watch in a cell just 20 feet from her office, rather than relying on jail officers to do so.  But negligence is insufficient to trigger liability under § 1983.  *See, e.g.*, *Goodman v. Kimbrough*, 718 F.3d 1325, 1332-33 (11th Cir. 2013) (holding that a failure to conduct a cell check and head count amounted to negligence but could not support a deliberate indifference claim absent evidence that the officers knew of a substantial risk of serious harm).  Because there is no evidence indicating that McCory knew McBride needed medical attention, McCory's failure to send McBride to the hospital or provide other medical care did not violate McBride's constitutional rights.  *See Jackson*, 787 F.3d at 1354 (holding that, without evidence that officers subjectively knew of a risk of suicide, the officers cannot be deliberately indifferent to the suicide risk for qualified immunity purposes).  Accordingly, the district court erred in denying McCory qualified immunity.

In contrast, McBride has come forward with sufficient evidence, viewed in the light most favorable to her, that Johnson acted with deliberate indifference in violation of McBride's constitutional rights.  First, a reasonable jury could find that

14

Johnson knew McBride suffered from a serious medical need.  The evidence shows that Johnson was aware on July 9 that McBride was unable to eat or drink.  The jury could also credit McBride's testimony that Johnson observed and commented on what looked like McBride's lips "peeling off."  McBride Dep. Tr. at 504, Doc. 172-11.  Moreover, a reasonable jury could find that Johnson knew the doctor had instructed jail staff to return McBride to the hospital if her condition worsened or she had any problems.  Karumanchi testified that he relayed this instruction to the transferring officer, and the officer confirmed that he would have then relayed the information to the jail supervisor.  Pursuant to jail policy, the jail supervisor then would have relayed the doctor's instruction to jail staff, including Johnson.  *See Campbell v. Johnson*, 586 F.3d 835, 841 (11th Cir. 2009) (acknowledging that it is reasonable to infer that a jail would follow its policies).  From these facts, the jury could find that on July 9, Johnson was aware of McBride's serious medical need and the doctor's instruction to seek medical attention.

Second, a reasonable jury could find that Johnson disregarded the risk of serious harm McBride faced and that Johnson's conduct was more than grossly negligent.  Rather than granting McBride's requests to receive immediate medical attention for her readily observable conditions, as required under jail policy and directed by the doctor, Johnson offered Vaseline and ice water.  Johnson's failure to seek medical attention for McBride under these circumstances can support a

15

§ 1983 claim of deliberate indifference. *See Carswell*, 854 F.2d at 458 (holding that, after specific requests for medical attention, the failure to provide medical care for an inmate who suffered from a skin rash, constipation, and significant weight loss constituted deliberate indifference); *Ancata*, 769 F.2d at 702, 704 (holding that providing non-prescription drugs such as Ben Gay and Tylenol II to treat a serious medical need —"swelling of the ankle, inability to sleep, chills, lower back pain, tingling and numbness of [the] hands, hyperventilation, severe pain in [the] back and right leg, [and] double vision"—amounted to far more than negligence and supported a deliberate indifference claim).  For these reasons, we agree that the record supports a finding that Johnson violated McBride's constitutional right.

## B.    Clearly Established Constitutional Right

Next, we must decide whether McBride's constitutional right was clearly established at the time of Johnson's conduct; if not, Johnson is entitled to qualified immunity.  *See Perez*, 809 F.3d at 1221-22.  "A right is 'clearly established' if it would have been apparent to every reasonable officer in [the defendant's] position" that her conduct was unlawful.  *Id.*; *see also Valderrama*, 780 F.3d at 1112.

> There are three ways in which [the plaintiff] may show that the right violated was clearly established: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a

16

constitutional right was clearly violated, even in the total absence of case law.

*Perez*, 809 F.3d at 1222 (internal quotation marks omitted).

This case falls into the second category:  The broad principles of our case law clearly establish the constitutional right violated.  *See Danley v. Allen*, 540 F.3d 1298, 1313 (11th Cir. 2008), *overruled on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  "Our earlier deliberate indifference decisions have stated that when jailers are aware of serious medical needs they may not ignore them or provide grossly inadequate care."  *Id.* (citing *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005), *abrogated on other grounds by Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472, 2476-77 (2015); *McElligott v. Foley*, 182 F.3d 1248, 1256 (11th Cir. 1999)); *see, e.g.*, *Carswell*, 854 F.2d at 457 (holding that the failure to provide medical care in the face of a known, serious medical need constitutes deliberate indifference); *Ancata*, 769 F.2d at 704 ("[K]nowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference.").  As discussed above, viewing the evidence in McBride's favor, her condition—a headache and sore throat so painful that McBride had been unable to eat or drink for days and a serious rash resulting in the skin on McBride's lips peeling off—along with her screaming for help, indicated the need for medical care which Johnson failed to provide.  Reasonable jailers would have been aware that Johnson's conduct as

17

described here violated clearly established constitutional rights. Accordingly, the district court did not err in denying Johnson's motion for summary judgment on qualified immunity grounds.

## IV. CONCLUSION

For the foregoing reasons, we conclude that, viewing the evidence in the light most favorable to McBride, Johnson is not entitled to qualified immunity on McBride's claim of deliberate indifference to her serious medical need under 42 U.S.C. § 1983. But, because McBride has failed to point to evidence suggesting that McCory was aware of McBride's serious medical need while she was detained in the City of Dothan Jail, McBride cannot establish that McCory violated a clearly established constitutional right, and thus the claim against McCory must be dismissed on qualified immunity grounds. We therefore affirm in part, reverse in part, and remand for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

18