[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-10539

_____

THOMAS B. IRELAND,
as personal representative of the estate of Gregg T. Ireland,
on behalf of the estate and the survivors, Karen E. Ireland
and Thomas B. Ireland,

Plaintiff-Appellant,

*versus*

BILL PRUMMELL,
as Sheriff of Charlotte County, sued in his official capacity,
CORIZON LLC,
a private health care corporation,
TABBATHA CARTER,
individually, Watch Commander at the Charlotte County Jail,
BRANDON SWARTZENTRUBER,
individually, Corrections Officer at the Charlotte County Jail,

MICHAEL WILES,
individually, Corrections Officer at the Charlotte County Jail,
ADAMAR GONZALEZ-FIGUEROA,
individually, Jail Physician,
MARGARET BRACY,
individually, Licensed Practical Nurse at the
Charlotte County Jail,
Zackary Heavener,
individually, Licensed Practical Nurse at the
Charlotte County Jail,
ROBERT SLEDZINSKI,
individually, Corrections Officer at the Charlotte County Jail,
ALAN SCHWOCHO,
individually, Corrections Officer at the Charlotte County Jail,
WILLIAM GARLICK,
individually, Corrections Officer at the Charlotte County Jail,
ALBERT L. BURROWS,
individually, Corrections Officer at the Charlotte County Jail, et al.,

Defendants-Appellees,

MICHAEL BURNETTE,
individually, Corrections Officer at the Charlotte County Jail,

Defendant.

———————————————

Appeal from the United States District Court
for the Middle District of Florida

D.C. Docket No. 2:17-cv-00468-PAM-MRM

———————————————

Before LAGOA, HULL, and MARCUS, Circuit Judges.

LAGOA, Circuit Judge:

Thomas Ireland, Gregg Ireland's father and the personal representative of Gregg Ireland's estate ("Ireland's Estate" or "Estate"), appeals the district court's grant of summary judgment for the named Defendants. This appeal stems from the circumstances surrounding Gregg Ireland's detention at the Charlotte County Jail and Ireland's eventual death. After a careful review of the record, and with the benefit of oral argument, we affirm the grant of summary judgment for the Sherriff of Charlotte County, the jail's health care provider, and the jail's medical personnel. We also affirm the grant of summary judgment for the jail's corrections officers.

## I.    FACTUAL AND PROCEDURAL HISTORY

On August 22, 2015, at about 2:25 a.m., Gregg Ireland was arrested by a Charlotte County Deputy Sherriff for driving under the influence of alcohol and taken to the Charlotte County Jail.  Ireland stood five feet, six inches tall and weighed 322 pounds.  A deputy at the jail administered an alcohol breath test to Ireland, and Ireland's blood alcohol content registered at 0.314, nearly four times the legal limit of 0.08.  Following that alcohol breath test, Ireland was taken from the jail directly to the local hospital—Charlotte Regional Medical Center—and arrived at around 4:30 a.m.[1] When Ireland arrived at the hospital, he smelled of alcohol but was in "no apparent distress" and was described by nurses as "cooperative" and "quiet."  Around 5:22 a.m., the emergency room physician wrote a disposition summary and diagnosed Ireland with "alcohol abuse" and "hypokalemia," i.e., low blood potassium.  Ireland's blood potassium level was 2.7 at 5:41 a.m., with the normal range being 3.5 to 5.1.  The emergency room physician prescribed Ireland potassium chloride to be taken every twelve hours for the next fifteen days for Ireland's low blood potassium level.  Ireland received his first dose at 5:59 a.m. at the hospital.  Ireland subsequently left the hospital at 6:13 a.m. after he was discharged.

Ireland returned to the jail but did not undergo a medical intake screening for more than five hours after his arrival.  At 11:35 a.m., a nurse finally completed the screening.  But she lacked access to Ireland's hospital records and therefore did not see his diagnoses or that he had been prescribed potassium chloride.  That said, she

did notice that Ireland had come from the hospital and thus assigned him to the jail infirmary with instructions for staff to monitor him for alcohol withdrawal symptoms. Over the course of the rest of the day, Ireland was monitored by nurses in the jail. And at no time did he show any signs of alcohol withdrawal, up through 9:00 p.m. on August 23—the next day.

At around 1:30 p.m. on August 23, a nurse informed the jail's on-call physician, Dr. Adamar Gonzalez, of the hospital's recommendation that Ireland take potassium chloride. Corizon[2]—the Charlotte County Jail's health care provider—however, had a policy not to honor prescriptions from other doctors. Rather than prescribing Ireland the potassium chloride that the hospital recommended, Dr. Gonzalez ordered a blood draw, which was scheduled for August 24, to find out whether Ireland was still suffering from hypokalemia.

Late during the night of August 23, at around 11:00 p.m., Ireland started causing a commotion, and other inmates testified they heard him screaming and shouting. During the early morning of August 24, at around 3:00 a.m., Ireland became increasingly agitated, and a physical altercation ensued with his cellmate, who

---

[1] The Charlotte County Jail Alcohol Withdrawal Protocol for breath tests registering over 3.0 requires that an inmate be taken to Charlotte Regional Medical Center for an evaluation.

[2] In the record below, Corizon is referred to both as Corizon LLC and Corizon Health, Inc. For ease of reference, we refer to the company simply as Corizon.

claimed that Ireland had poured water on him while he was sleeping. Officer Brandon Swartzentruber reported that, at around that time, he heard a loud noise coming from Ireland's cell and that he went to inspect the cell.

After opening the door to the cell and observing water on the uniform of Ireland's cellmate, Officer Swartzentruber decided to move the cellmate to another cell. At around the same time, Officer Swartzentruber observed Ireland "sweating profusely and [seeming] anxious." As the cellmate exited the cell, Officer Swartzentruber asked Ireland to move towards the rear of the cell and to have a seat, so Swartzentruber could collect the cellmate's belongings. Ireland refused. Officer Swartzentruber then made the same request several more times, but Ireland continued to refuse. As Officer Swartzentruber reached down to grab the cellmate's "boat"—a plastic bed—at around 3:26 a.m., Ireland reached down and attempted to push it towards Officer Swartzentruber. Officer Swartzentruber ordered Ireland to sit down. According to Officer Swartzentruber, Ireland "tensed and took a step towards" him. This led Officer Swartzentruber to deploy his taser (a five-second cycle) at 3:27 a.m.

With Ireland now incapacitated on the ground, Officer Swartzentruber requested emergency backup and ordered Ireland to lay flat on his stomach and to place his arms behind his back. Ireland refused and attempted to stand up, leading Officer Swartzentruber to continue to deploy his taser. At some point, Ireland managed to remove one of the prongs of the taser. Around

the same time, Officer Swartzentruber's requested backup officers arrived at the scene.

As relevant to this appeal, in addition to Officer Swartzentruber, Officers Michael Wiles, Robert Sledzinski, Alan Schwocho, William Garlick, and Albert Burrows were present in the cell at points during the attempt to restrain Ireland.[3]  Additionally, Officer Tabbatha Carter monitored the encounter from the jail's control room, as the watch officer on duty.  At some point during the encounter, Officer Wiles sat on Ireland's back to try to get him into handcuffs, while Ireland's hands were underneath his stomach, and struck Ireland twice.  Officer Sledzinski also tased Ireland.  The other named officers in the cell all played roles in attempting to restrain Ireland at points, as he continued not to comply with their attempts.  Because they were first unable to get Ireland into handcuffs and shackles and to comply with their commands, they continued to apply physical force to Ireland while Ireland was on his stomach.  At some point, one of the cellmates in the proximate area overheard Ireland saying, "I can't.  I just got tased," and another cellmate heard Ireland say, "I'm not resisting," in response to the various officers' commands.  During the encounter, various officers reported that Ireland also tried to spit on and bite the officers, which caused the officers to eventually put a spit mask on him.  All in all, the officers had to shackle Ireland's legs,

---

[3] We discuss the officers' relevant testimony in the analysis below.

tase him nine times, apply a spit mask, and place him in handcuffs to restrain him.

During the encounter, Ireland's Estate contends that Ireland was unable to effectively comply with the officers' commands, due to the combination of alcohol withdrawal symptoms (delirium tremens), such as seizures, and the side effects associated with being tased and the application of physical force. The Estate claims that many of Ireland's physical movements and reflexes were attributed to seizures because he lost control of his motor functions. The Estate further attributes Ireland's inability to submit to being restrained to the physical nature of the force that the officers applied to Ireland, like Officer Wiles's decision to sit on Ireland, thereby prolonging the officers' use of physical force and the application of the taser because Ireland could not roll over and submit to being handcuffed. The Estate attributes Ireland's thrashing and spitting in the cell to noncontrollable reactions to the application of physical force by the various officers that made it hard for Ireland to breathe.

After the officers restrained Ireland, the officers called a nurse to check on him—Nurse Margaret Bracy. Before she arrived, Ireland had become unresponsive. Because of the crowding in the cell by the various officers, Nurse Bracy was not initially able to "properly assess" Ireland. By the time Nurse Bracy entered the cell, Ireland had come to, was lying face down, bleeding from a laceration to his forehead, and swearing. After observing Ireland, Nurses Bracy and Zackary Heavener tried calling Dr. Gonzalez for advice

on how to proceed, but Dr. Gonzalez did not pick up the phone despite being called four times.  Eventually, the nurses reached a different doctor (Dr. Nicholas Delgado), who prescribed Valium for Ireland.  That Valium, however, was never administered.

The officers then moved Ireland to a second cell—where the camera did not work—and then again to a third cell for observation.  At some point during these moves, Ireland became unconscious; though, it is unclear when he lost consciousness.  The officers contend that Ireland did not lose consciousness until after he was moved to the third cell.  But Ireland's Estate contends that he lost consciousness shortly after the altercation ended in the first cell.  Ireland's Estate also contends that Ireland was repeatedly dropped during his moves between the cells.

It is undisputed that, after being moved to the third cell, the officers were aware that Ireland was unconscious and they requested EMS support.  Officers Swartzentruber and Wiles also performed CPR on Ireland.  Nurses Bracy and Heavener then entered the room, began performing CPR, and attempted to use a defibrillator on Ireland, but their efforts to revive Ireland failed.

When EMS arrived at about 4:27 a.m., they took over the CPR efforts and transported Ireland to the hospital via ambulance.  On arrival to the hospital, Ireland's potassium level registered 3.0.  Twelve hours after Ireland's admission to the hospital, his potassium level registered 3.1, but it subsequently decreased to 2.9 at the fourteen-hour mark.  At the hospital, Ireland was diagnosed with severe sepsis caused by infection, which transgressed into septic

shock and multi-organ failure.  During his time at the hospital, Ireland was unresponsive and intubated.  By 7:10 p.m. on August 24, his prognosis was poor.  Less than a day later, Ireland was pronounced brain dead and removed from life support.

On August 21, 2017, Ireland's Estate brought a seven-count complaint against the named Defendants.  Ireland's Estate sued Corizon (the jail's health care provider and employer of the nurses and doctors involved in this case) in Count 1, Dr. Gonzalez in Count 2, and Nurses Bracy and Heavener in Count 3 for deliberate indifference actionable under 42 U.S.C. § 1983 because of these parties' alleged failure to treat Ireland during his pretrial detention.  In Count 4, Ireland's Estate sued Sheriff Bill Prummell, the Sheriff of Charlotte County, in his official capacity for deliberate indifference under § 1983.  In Count 5, Ireland's Estate sued the relevant corrections officers for deliberate indifference, excessive force, and failure to intervene to prevent the use of excessive force under § 1983.  In Count 6, Ireland's Estate sued Sheriff Prummell in his official capacity under a state-law theory of wrongful death.  And, in Count 7, Ireland's Estate sued Corizon under a state law theory of wrongful death.

On November 1, 2019, Corizon, Dr. Gonzalez, and Nurses Bracy and Heavener moved for summary judgment.  On that same day, Sheriff Prummell and the corrections officers also filed motions for summary judgment.  On January 23, 2020, the district court granted each of the summary judgment motions in full, finding that Ireland's Estate failed to present evidence sufficient to raise

a genuine issue of material fact on any of the claims, and entered final judgment for the Defendants.  This timely appeal ensued.

## II.    STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo, applying the same legal standards used by the district court.  *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'"  *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  A district court should grant summary judgment when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case."  *Nolen v. Boca Raton Cmty. Hosp., Inc.*, 373 F.3d 1151, 1154 (11th Cir. 2004).  In reviewing the grant of summary judgment, we view the evidence in the light most favorable to the nonmoving party—here, Ireland—and draw all reasonable inferences in his favor.  *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999).

The nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To do this, the nonmoving party must either point to evidence in

the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116–17 (11th Cir. 1993).  But "[a] mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004).

## III.    ANALYSIS

Each of the Estate's seven counts are brought under one of three theories.  The first theory is one of deliberate indifference in that the Estate argues that Corizon, the Sheriff, the doctor and the nurses who treated Ireland, and the corrections officers did not provide proper medical care and attention to Ireland during his pretrial detention.  Respectively, Counts 1, 2, 3, and 4 against Corizon, Dr. Gonzalez, Nurses Bracy and Heavener, and Sheriff Prummell expressly advance the idea that these defendants did not provide proper care and attention to Ireland.  Part of Count 5, which Ireland's Estate asserted against the various corrections officers, also encapsulates this idea.  The second theory, which is directly advanced in Count 5 against the various corrections officers, involves excessive force and the failure to intervene to prevent the use of excessive force.  Ireland's Estate claims that, in tasing and beating Ireland, the corrections officers violated his Fourteenth Amendment right to be free of excessive force.  Finally, the third theory involves wrongful death, brought under Florida state law, against

Sheriff Prummell and Corizon in Counts 6 and 7, respectively. We address these theories in turn.

## A. Deliberate Indifference to Ireland's Medical Care and Pretrial Detention Needs

The Fourteenth Amendment requires government officials to provide basic necessities, including medical care, to pretrial detainees.[4] *Hamm v. DeKalb County.*, 774 F.2d 1567, 1574 (11th Cir. 1985). A failure to provide such care violates that amendment, which is actionable under § 1983. *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015). To prevail on such a claim, a litigant "must satisfy both an objective and a subjective inquiry." *Id.* (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)). The objective inquiry requires a plaintiff to establish the existence of an "objectively serious medical need." *Id.* The subjective

---

[4] This standard finds its roots in the Eighth Amendment's proscription of cruel and unusual punishment against prison inmates. *See generally Hamm*, 774 F.2d at 1571–74. The Fourteenth Amendment's promise of due process subsequently provides a coextensive protection for pretrial detainees. *Id.* at 1574 ("This court holds that in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons."); *accord Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009). Indeed, we have noted that "decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees" when it comes to "[c]laims involving the mistreatment of arrestees or pretrial detainees in custody." *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996).

inquiry requires a plaintiff to prove that a government official was "deliberatively indifferent" to that need. *Id.* We have synthesized this "deliberate indifference" inquiry into four elements: (1) the official "was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," (2) the official "actually drew that inference," (3) the official "disregarded the risk of serious harm," and (4) the official's "conduct amounted to more than gross negligence."[5] *Id.* The mere fact that medical care is

---

[5] It is well established that "deliberate indifference l[ies] somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). This Court noted "a tension within our precedent regarding the minimum standard for culpability under the deliberate-indifference standard." *Patel v. Lanier County.*, 969 F.3d 1173, 1188 n.10 (11th Cir. 2020). Many of our cases state that "a claim of deliberate indifference requires proof of more than gross negligence," *see, e.g.*, *Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010), while some cases state that a claim of deliberate indifference requires proof of "more than mere negligence," *see, e.g.*, *Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016), *abrogated on other grounds* by *Bell Atl. Corp. v Twombly*, 550 U.S. 544 (2007). Despite this tension, in *Cottrell*, this Court, in interpreting *Farmer*, which fleshed out the deliberate indifference culpability standard, definitively stated that *Farmer* "makes it clear that 'gross negligence' is not part of the standard for judging custody mistreatment claims under the Due Process Clause" of the Fourteenth Amendment. 85 F.3d at 1490. This is because deliberate indifference requires something *more*—"that the defendant had a 'sufficiently culpable state of mind,'" which "is 'the equivalent of recklessly disregarding' a substantial risk of serious harm to the inmate." *Id.* at 1490–91 (quoting *Farmer*, 511 U.S. at 834, 836); *cf. Patel*, 969 F.3d at 1188 n.10. Thus, we believe that a *more* than gross negligence culpability standard is the correct standard under the deliberate indifference framework. Nevertheless, as

eventually provided is insufficient to defeat a claim for deliberate indifference. *Id.* An official may still act with deliberate indifference "by delaying the treatment of serious medical needs." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). But in making the determination of whether any particular delay is unconstitutional, the applicable court must consider "the reason for the delay and the nature of the medical need." *Id.*

We begin by addressing the claims in Counts 1 and 4 that Corizon and Sherriff Prummell failed to provide proper medical care and attention to Ireland during Ireland's pretrial detention and thus were deliberately indifferent to Ireland's needs.

### 1. *Claims Against Corizon and Sheriff Prummell (Counts 1 and 4)*

Ireland's Estate appeals the district court's grant of summary judgment for Corizon and Sherriff Prummell on the Estate's deliberate indifference to Ireland's medical and pretrial detention needs claims actionable under § 1983. In short, Ireland's Estate argues that both Corizon and Sheriff Prummell maintained a policy

---

discussed in sections III.A.1, III.A.2, and III.A.3, we conclude that these various defendants, who are the subjects of the deliberate indifference claims, were not deliberately indifferent under either standard described in the "tension within our precedent." *Patel*, 969 F.3d at 1188 n.10.

or custom of deliberate indifference to Ireland's medical care and pretrial detention needs.

As a preliminary matter, we address Sherriff Prummell and Corizon's relationship with Charlotte County, i.e., the governmental entity in charge of the Charlotte County Jail. Ireland's Estate brought suit against Sheriff Prummell in his official capacity. Thus, the Estate's suit against Prummell is, in essence, a suit against Charlotte County. See Kentucky v. Graham, 473 U.S. 159, 165 (1985) (explaining that a suit against a government officer in his official capacity is equivalent to a suit "against [the] entity of which [the] officer is an agent" (quoting Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. 658, 690 & n.55 (1978))). Charlotte County contracts its prison health services to Corizon. But this does not absolve Charlotte County of liability. See Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 705 (11th Cir. 1985) (noting that a county's duty to provide medical care to incarcerated individuals "is not absolved by contracting with an entity such as [Corizon]," that "the county itself remains liable for any constitutional deprivations caused by the policies or customs" of the contracted entity, and that, "[i]n that sense, the county's duty is non-delegable"). Finally, a private company, like Corizon, may be liable under § 1983 when it "performs a function traditionally within the exclusive prerogative of the state" or county, such as providing medical services

to pretrial detainees or inmates.[6] *Craig v. Floyd County*, 643 F.3d 1306, 1310 (11th Cir. 2011) (quoting *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997)).  Thus, we analyze the claims against Corizon and Sheriff Prummell, as representatives of Charlotte County, together.

Liability under § 1983 cannot be based on the theory of vicarious liability. *Id.* at 1310.  Thus, to prevail on deliberate indifference to serious medical or pretrial detention needs claims against Corizon or Sheriff Prummell, Ireland's Estate must first show that Corizon or Sheriff Prummell, as representatives of Charlotte County, advanced "a '*policy or custom*' of deliberate indifference that led to the violation of [Ireland's] constitutional right" before satisfying the discrete requisites of the Estate's deliberate indifference claims, as described above.  *Id.*  (emphasis added) (quoting *Monell*, 436 U.S. at 694).  "A policy is a decision that is officially adopted by the [governmental entity], or created by an official of such rank that he or she could be said to be acting on behalf of the [governmental entity]" while "[a] custom is a practice that is so settled and permanent that it takes on the force of law."  *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997).  "Proof of a single incident of unconstitutional activity is not sufficient to impose liability" on a governmental entity as part of either a policy or custom unless the challenged policy itself is unconstitutional.

---

[6] There is no dispute among the parties that Corizon—as the provider of medical services in a jail—was performing a traditional public function.

*City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion); *accord Craig*, 643 F.3d at 1310–11.

Here, the district court concluded that Ireland's Estate had failed to carry its burden of establishing a reasonable dispute of material fact regarding whether either Corizon or Sheriff Prummell advanced an unconstitutional policy or custom. Specifically, the district court found that Ireland's Estate presented "no evidence" of an unconstitutional policy or custom and, at most, that Ireland's Estate pointed to isolated incidents by Corizon and Sherriff Prummell. We agree with the district court and first turn to the Estate's allegations against Corizon.

Ireland's Estate argues that Corizon improperly denied, and was deliberately indifferent to, Ireland's medical care based on various policies or customs. For instance, the Estate argues that Corizon had a policy or custom of denying medication to those in Corizon's care that contributed to poor quality of care, largely based on the fact that Ireland never received his potassium chloride medication. But the only evidence that Ireland's Estate attempted to introduce to support its argument is a series of newspaper articles. The Estate notes that these articles show that Corizon, on two separate occasions at other jails, refused to provide inmates their requested medications. *See* Anne Easker, *Inmates Say They Were Denied Medical Care*, Port Charlotte Sun (July 8, 2019), https://www.yoursun.com/charlotte/news/inmates-say-they-were-denied-medicine/article_90b7f5ce-66c4-11e9-acc9-ff8aa6e6dcd6.html; Anne Easker, *Sun Investigation of Charlotte*

*County Jail Reveals Complaints About Improper Medical Care*, Port Charlotte Sun (July 6, 2019), https://www.yoursun.com/englewood/news/sun-investigation-of-charlotte-county-jail-reveals-complaints-about-improper/article_b1310c94-5fb4-11e9-b939-938d0da08c14.html.

These articles, however, show only unconnected and random incidents. In one of the situations described in the articles, the inmate received some medication, but not the medication the inmate says she required. In another, Corizon explained that the inmate was complaining only because she had not received narcotics, which Corizon tries not to prescribe. And as we have previously held, "random acts or isolated incidents are insufficient to establish a custom or policy." *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986); *accord McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004).

The incidents described in the articles are not sufficiently connected to the challenged action at issue here—i.e., delaying a blood draw before prescribing potassium chloride—to constitute a policy or custom. The Estate's own averments make this clear—Ireland's Estate is not complaining (as the other inmates in the news articles did) of an absolute deprivation of medication. Indeed, Ireland received his first dose of potassium chloride at the hospital because the officers promptly transported him there after his initial arrest. Rather, the complaint is that the requirement of taking a blood test resulted in the delay of administering Ireland additional potassium chloride. Thus, Ireland's Estate has presented no

evidence that Corizon advanced a policy or custom of delaying blood tests or that Corizon advanced a policy or custom of depriving inmates of medication, which routinely caused injury.

Ireland's Estate also argues that the delay in Ireland's medical intake and screening constitutes evidence of a broader policy or custom of inadequate intakes and screenings.  But Ireland's screening is a single instance of allegedly wrongful conduct, and it is established law that proof of a single incident of unconstitutional activity is not sufficient to demonstrate a policy or custom for purposes of § 1983 liability.  *Craig*, 643 F.3d at 1310.  Rather, a plaintiff must establish the existence of a pattern of similar violations.  *Id.* Indeed, "[i]n the absence of a series of constitutional violations from which deliberate indifference can be inferred, the plaintiff must show that the policy itself is unconstitutional," which Ireland's Estate has not done.  *Id.* at 1311 (alteration adopted) (quoting *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000)).  Rather, Ireland's Estate argues that the screener—an individual that Ireland did not sue—"did not show good judgment . . . [and] missed [hospital] lab reports on Ireland's liver condition."  By the Estate's own admission then, this was not an issue of an unconstitutional policy or custom, but rather, a one-off incident by the screener.

Ireland's Estate further argues that Corizon had a policy or custom of keeping inadequate medical records, a policy of inadequate staffing, and a policy of inadequate physician oversight. There are two problems with these arguments.  First, the Estate

does not attempt to show that these purported policies or customs *caused* any constitutional violation. *See Craig*, 643 F.3d at 1310 (explaining that a former pretrial detainee needed to show that a jail health care contractor's policy or custom "*led* to the violation of his constitutional right" (emphasis added)). Second, there is no record evidence to support any such policies or customs. Indeed, the Estate instead relies only on Ireland's own experience at the jail. And, as noted previously, a single instance of allegedly wrongful conduct cannot establish an unconstitutional policy or custom. In order to survive summary judgment, Ireland's Estate needed to produce evidence sufficient to create genuine disputes of material fact on the following elements of liability under § 1983: (1) that Ireland's constitutional rights were violated; (2) that Corizon had a policy or custom that constituted deliberate indifference to that constitutional right; and (3) that this policy or custom caused the constitutional violation. *See id.* Because the Estate failed to plead sufficient facts to establish the existence of a policy or custom, or that the alleged policy or custom caused the constitutional violation, we conclude that the district court did not err in granting summary judgment for Corizon as to Count 1.

We now turn to the claims against Sherriff Prummell under Count 4. At top, Ireland's Estate contends that Sheriff Prummell "had a non-delegable duty to provide medical care for prisoners" and was "deliberately indifferent to known risks of serious harm to" Ireland. The Estate attempts to support this contention with a litany of allegations, including that Sherriff Prummell understaffed

the jail, failed to train and supervise staff in his jail about the needs of pretrial detainees with medical conditions, and was indifferent to the alleged malfeasance of his staff toward pretrial detainees with medical conditions, among others. The district court found that Ireland's Estate failed to present any evidence supporting these claims, and we agree.

Our decision in *McDowell v. Brown* is instructive. In that case, the plaintiff, an inmate at a county jail, brought claims against the county, asserting that certain jail policies constituted deliberate indifference. 392 F.3d at 1285–86. Specifically, the inmate claimed that the jail understaffed the transport system from the jail to the hospital and that the resultant delay caused by such understaffing constituted deliberate indifference to the treatment of the inmate's medical condition. *Id.* at 1289.

Like the facts here, in *McDowell,* the inmate was first seen and treated at a hospital for a medical condition. *Id.* at 1286. After that treatment, he was returned to the jail. *Id.* But the next day, he reported to jail officials an inability to urinate and difficulty walking. *Id.* He was then seen by a nurse at the jail, who recommended sending him back to the hospital. *Id.* Because jail officers only could take one inmate to the hospital at a time under the policy in place, the inmate's scheduled transport for the next morning was delayed several times when other inmates with mental health issues were given priority. *Id.* at 1287. Later that day, the inmate lost feeling in his legs, and the officers finally called an ambulance to take him to the hospital. *Id.* Once at the hospital, the inmate

was diagnosed with spinal cord compression and underwent surgery. *Id.* And, after the surgery, the inmate remained an incomplete paraplegic. *Id.* The inmate subsequently brought suit, and the district court ultimately granted summary judgment for the county.

This Court, on appeal, affirmed the grant of summary judgment. *Id.* at 1294. We noted that the "threshold identification of a custom or policy 'ensures that a [county] is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the [county].'" *Id.* at 1290 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04 (1997)). Because the inmate could not "point to another occasion when the Jail's understaffing, and resulting inability to transport, contributed to or exacerbated an inmate's medical condition," we concluded that the inmate had presented evidence only of an "isolated incident" rather than a "persistent" and "widespread" "policy of understaffing the Jail so as to delay the transfer of inmates to" the hospital. *Id.* at 1290–91. We also noted that, because this case was presented in the deliberate indifference context, the inmate could not rely even on a "generalized policy of understaffing" but had to show a "deliberate intent" to understaff the jail medical transport team. *Id.* at 1291 (quoting *Anderson v. City of Atlanta,* 778 F.2d 678, 687 (11th Cir. 1985)). This is because, in the deliberate indifference context, "a 'showing of simple or even heightened negligence is not enough.'" *Id.* (quoting *Brown*, 520 U.S. at 407).

We also explained that the inmate failed to satisfy the causation element of the inquiry because he had not shown that the county's "deliberate conduct . . . was the 'moving force' behind [his] injury." *Id.* at 1292 (emphasis removed) (quoting *Brown*, 520 U.S. at 404). To "test the link" between the injury and the county's conduct, *Brown*, 520 U.S. at 412, we looked "to whether a complete review of the budget decision (and the resulting understaffed Jail) reveal[ed] that the [county] should have known that [the inmate's] injuries were a 'plainly obvious consequence' of that decision," *McDowell*, 392 F.3d at 1292 (quoting *Brown*, 520 U.S. at 412). We explained that "[w]hile it may be true that the [county's] budget decision would make a violation of his constitutional rights 'more *likely*,' that alone cannot 'give rise to an inference that a policymaker's failure to scrutinize the [budget] . . . produced a specific constitutional allegation.'" *Id.* (some alterations in original) (quoting *Brown*, 520 U.S. at 411). And we concluded that the inmate had presented no evidence that the policy itself caused any injury as there was no evidence that any jail budget decision had, as its "plainly obvious consequence," the type of injury sustained by the inmate. *Id.* (quoting *Brown*, 520 U.S. at 412).

The lessons of *McDowell* hold obvious relevance to this case. There, like this case, the relevant jail had a policy that, at first blush, appears likely to cause injury. In *McDowell*, the policy was transporting inmates to the jail one at a time, thus *necessarily* causing delay in medical treatment. *Id.* at 1282. In this case, the only possible official policy at issue is the reexamining of inmates for

20-10539              Opinion of the Court              25

their medical conditions and reordering their prescriptions, which also *necessarily* causes delay in medical treatment. Just like the inmate in *McDowell*, Ireland's Estate failed to present evidence of substantially similar events and failed to show that the "plainly obvious consequence" of the policy at issue was to cause serious injury. To "test the link" between Ireland's injury and Sheriff Prummell's conduct, we look to whether a complete review of the screening/medical intake decision reveals that Sheriff Prummell should have known that Ireland's injuries were a "plainly obvious consequence" of that decision. We find no such evidence presented here. Even making all reasonable inferences in Ireland's favor, we must agree with the district court that Ireland's Estate failed to demonstrate a genuine issue of material fact that Sheriff Prummell acted with conscious disregard.[7] *See Davis v. DeKalb Cnty. Sch. Dist.*, 233 F.3d 1367, 1374–75 (11th Cir. 2000); *McDowell*, 392 F.3d at 1292–93.

★ ★ ★ ★

---

[7] As to any other allegations underlying the Estate's overall contention that Sheriff Prummell advanced some sort of policy or custom that demonstrated indifference to Ireland's medical and pretrial detention needs—e.g., failing to properly train and supervise staff—we agree with the district court that the Estate "has no evidence of prior incidents similar to Ireland's situation" and no evidence of Sherriff Prummell having notice of the need to train his staff in a different fashion. *See Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (explaining that "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action").

In sum, we conclude that the Estate's claims against Corizon and Sheriff Prummell fail because the Estate has failed to identify any unconstitutional policy or custom that caused Ireland's injury. Because the district court did not err in granting grant summary judgment for Corizon and Sheriff Prummell, we affirm the entry of summary judgment as to Counts 1 and 4. We now turn to the claims against Dr. Gonzalez and Nurses Bracy and Heavener.

2. *Claims Against Dr. Gonzalez and Nurses Bracy and Heavener (Counts 2 and 3)*

Ireland's Estate appeals the district court's grant of summary judgment for Dr. Gonzalez and Nurses Bracy and Heavener (collectively, the "Nurses"). The Estate had brought claims under Counts 2 and 3, alleging that these defendants were deliberatively indifferent in their failure to provide medical treatment to Ireland.

As discussed above, to succeed on a deliberate indifference claim, a plaintiff must show "subjective awareness" of an objectively serious medical need. *See Valderrama*, 780 F.3d at 1116. Thus, assuming Ireland had an objectively serious medical need at points during his detention, Ireland's Estate must show that Dr. Gonzalez and the Nurses: (1) were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"; (2) that they "actually drew that inference"; (3) "disregarded the risk of serious harm"; and (4) demonstrated "conduct amount[ing] to more than gross negligence." *Id.* Under this framework, "a complaint that a [medical professional] has been negligent in diagnosing or treating a medical condition does not state a valid

claim of medical mistreatment." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Indeed, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner," *id.* at 106, "[n]or does a simple difference in medical opinion" become one, *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989). That said, "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott*, 182 F.3d at 1255. With these principles in mind, we conclude that Counts 2 and 3 must fail.

We first consider Count 3 against the Nurses. Ireland's Estate argues that the Nurses were deliberately indifferent in their failure to treat Ireland. In support of this argument, Ireland's Estate claims that the Nurses knew about Ireland's medical condition and subsequently failed to administer potassium chloride. Ireland's Estate also claims that the Nurses did not call Dr. Gonzalez in a timely manner.

These claims must fail for the following reasons. First, neither Nurse Bracy nor Nurse Heavener participated in Ireland's initial medical screening, so any claim against the Nurses based on the notion that the screening was constitutionally inadequate does not pass muster. Second, it is undisputed that the Nurses cannot prescribe medication without a doctor's order. Therefore, even if the decision not to administer potassium chloride immediately upon

notice of the hospital records was infirm (a contention we address below), that contention cannot be maintained against the Nurses who could not prescribe medication. Third, as to the contention that the Nurses did not call Dr. Gonzalez in a timely manner, the Nurses, upon observing Ireland's condition, immediately began calling Dr. Gonzalez for a prescription to treat Ireland's condition. During the hour between their observation of Ireland's condition and another doctor prescribing Valium, the Nurses called Dr. Gonzalez four times, left messages on her voicemail, reached out to a different doctor, and informed that second doctor of Ireland's condition. Therefore, as the district court said, the "fact that [Dr.] Gonzalez did not answer the phone cannot make [Nurses] Heavener and Bracy liable."

Our opinion in *McElligott v. Foley* is instructive for purposes of this appeal. In that case, an inmate was incarcerated in early August and immediately presented severe abdominal pain. *Id.* at 1251–52. The only registered nurse in the jail was immediately notified of the situation but gave the inmate only Pepto Bismol. *Id.* A month later, the nurse was notified that the inmate had begun vomiting and continued to experience severe intestinal pain, but she did nothing. *Id.* Over the next two months, the inmate continued to plead with the nurse and the jail's doctor for treatment for his severe abdominal pain, but they gave him only Pepto Bismol, Tylenol, and an anti-gas medication. *Id.* at 1252–53. By the end of January—months after intake and after the inmate's daughter contacted the deputy director of the jail—the deputy

director wrote to the nurse, "telling her to look into [the inmate's] case," but it did "not appear that [the nurse] ever did so." *Id.* at 1253. In February, the jail doctor finally ordered bloodwork and a CT scan, which showed an intestinal obstruction. *Id.* at 1253–54. On February 10, the nurse ran an estimate, which concluded that the cost of hospitalization for the inmate "would be approximately $8,000–15,000 or higher." *Id.* at 1254. The next day, the jail "prematurely released" the inmate, who was later seen by a local VA hospital and diagnosed with terminal cancer. *Id.* In reversing the district court's grant of summary judgment, this Court concluded that the nurse's persistent and conscious refusal to render medical care or to respond to the inmate's pleas for medical help constituted deliberate indifference. *Id.* at 1260.

Here, the actions of Nurses Bracy and Heavener are in stark contrast with the nurse in *McElligott.* The Nurses relied on the medical advice of Dr. Gonzalez in their treatment of Ireland, made every attempt to contact Dr. Gonzalez when Ireland's situation worsened, and reached out to a second doctor and informed the second doctor of Ireland's condition. We conclude that the Nurses' actions did not constitute deliberate indifference and therefore affirm the district court's grant of summary judgment in their favor as to Count 3.

We now turn to Count 2 against Dr. Gonzalez. Like the Estate's claims against the Nurses, Ireland's Estate argues that Dr. Gonzalez exhibited deliberate indifference to Ireland's medical care by failing to provide Ireland with proper treatment. The crux of

the Estate's argument centers on the ideas that Dr. Gonzalez failed to give Ireland potassium chloride in a timely manner, that she exhibited poor medical judgment regarding Ireland's treatment, and that she was unresponsive to Ireland's needs. Despite the Estate's contentions, neither mere medical malpractice, *Estelle*, 429 U.S. at 106, nor a minor difference in medical opinion constitute deliberate indifference, *Waldrop*, 871 F.2d at 1033. Thus, even if Dr. Gonzalez's decision to run bloodwork before prescribing any medication of her own constituted more than a difference in medical opinion and was unsound—it was, at worst, negligent. As soon as Dr. Gonzalez was informed of the hospital bloodwork, she responded to that information. Relying on her training and experience, she then ordered her own bloodwork to see if Ireland still needed the potassium chloride—a decision that should be given deference. *Cf. Youngberg v. Romeo*, 457 U.S. 307, 322 & n. 29 (1982) (emphasizing that "courts must show deference to the judgment exercised by a qualified professional" in detention facilities and collecting cases).

While one might argue that the more prudent course of action would have been to simply prescribe the potassium chloride right away, the decision to do her own bloodwork does not constitute deliberate indifference. Here, Dr. Gonzalez did not ignore the information contained in the medical record. Her decision to run her own bloodwork is insufficient, standing alone, to create a triable issue of material fact. To recover on a claim of inadequate medical care, Ireland's Estate had to show that jail officials engaged in "acts or omissions sufficiently harmful to evidence deliberate

indifference to [his] serious medical needs." *Hamm*, 774 F.2d at 1575 (alteration in original) (quoting *Estelle,* 429 U.S. at 106). "Although [Ireland] may have desired different modes of treatment, the care the jail provided did not amount to deliberate indifference." *Id.* And although it is true that "a doctor's decision to take an easier and less efficacious course of treatment" may constitute deliberate indifference, "mere medical malpractice[] does not constitute deliberate indifference." *Waldrop*, 871 F.2d at 1033.

Furthermore, insofar as the Estate seeks to argue that Dr. Gonzalez's failure to answer the phone opens her up to liability, such action, or inaction, is insufficient as a matter of law to constitute deliberate indifference. To succeed on such a claim, a plaintiff must show that the defendant was *actually aware* of a serious medical need. *See Valderrama*, 780 F.3d at 1116. Here, the Estate failed to present any record evidence that Dr. Gonzalez was aware—actually or constructively—of Ireland's medical need on August 24 while the Nurses attempted to call.

We therefore conclude that the district court did not err in granting summary judgment for Dr. Gonzalez and Nurses Bracy and Heavener. Thus, we affirm the district court's entry of summary judgment as to Counts 2 and 3.

### 3. *Deliberate Indifference Claims Against the Corrections Officers (Count 5)*

Ireland's Estate also appeals the district court's grant of summary judgment for the corrections officers. While Count 5

contains an excessive force claim, certain elements of Count 5 can be viewed as deliberate indifference claims. Thus, we address those elements now and address the separate excessive force contentions brought under Count 5 in the next section. The deliberate indifference claims in Count 5 center on the notion that the various corrections officers were deliberately indifferent to Ireland's medical care and needs.

Once again, to succeed on a deliberate indifference claim, a plaintiff must show "subjective awareness" of an objectively serious medical need. *See Valderrama,* 780 F.3d at 1116. And, as discussed above, Ireland's Estate must show that: "(1) the officer was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, (2) the officer actually drew that inference, (3) the officer disregarded the risk of serious harm, and (4) the officer's conduct amounted to more than gross negligence." *Id.* The district court found that there was "no evidence that any of the officers knew or even should have known of Ireland's chronic alcoholism, much less that he might suffer from [delirium tremens] seizures." Indeed, the district court found that Ireland's Estate "offer[ed] only speculation" as to the officers' knowledge of Ireland's medical condition and his need for medical care. We agree.

Even if we assume alcoholism is an objectively serious medical need, as the Estate argues, and further assume that the officers' actions constituted more than gross negligence, the claim against the officers would still fail because the Estate has failed to adduce

facts from which an inference can be drawn that the officers were aware of Ireland's need for medical attention. The Estate argues that an inference may be drawn that the officers who entered Ireland's cell were aware of his need for medical treatment for his chronic alcoholism from the following facts: (1) Ireland said that he needed medication for his alcohol withdrawal and (2) Ireland was housed in the medical wing. But, as the Estate admits, inmates can be housed in the medical wing for any number of reasons. Moreover, an officer is not constitutionally required to excuse an inmate's noncompliance with commands merely because he happens to be in the medical wing. Cf. *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 326 (2012) ("Maintaining safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face."). The record evidence establishes only that another inmate (not an officer) heard Ireland's statement that Ireland needed medical aid for his delirium tremens, and, by that witness's own admission, Ireland made the statement about five minutes before the officers arrived at Ireland's cell. The record therefore lacks evidence from which an inference can be made that the officers who entered Ireland's cell to subdue him—after Ireland physically fought with his cellmate—had any subjective knowledge of his need for medical attention based on chronic alcoholism.

To be sure, the Supreme Court has made clear that circumstantial evidence of an obvious risk of harm can be used to establish

subjective awareness. *See Farmer*, 511 U.S. at 842. But here, Ireland's Estate cannot identify any facts suggesting that the officers "had been exposed to information concerning the risk" of Ireland's condition and "thus 'must have known' about it," such that we can infer that they had "actual knowledge of the risk." *Id.* at 842–43.

Because there is no evidence in the record from which we can infer that the officers were aware of Ireland's need for medical aid at any time during the encounter before he ultimately lost consciousness, the deliberate indifference to medical treatment claims against the officers fail and summary judgment in their favor was proper for this portion of Count 5. We now move to the excessive force and failure to intervene portion of Count 5.

## B. Excessive Force Claims Against the Officers (Count 5)

Ireland's Estate appeals the district court's grant of summary judgment for the corrections officers on the Estate's excessive force and failure to prevent the use of excessive force claims under Count 5. Under the Due Process Clause of the Fourteenth Amendment, "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The Due Process Clause has been construed to "forbid the use of excessive force" against pretrial detainees. *Crocker v. Beatty*, 995 F.3d 1232, 1246 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 845 (2022).

"We review the grant or denial of qualified immunity . . . at summary judgment *de novo*, viewing the facts in the light most favorable to the nonmoving party." *Tillis on behalf of Wuenschel v. Brown*, 12 F.4th 1291, 1296 (11th Cir. 2021).

"Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996). "Once the qualified immunity defense is raised, plaintiffs bear the burden of showing that the federal rights allegedly violated were clearly established." *Id.* Thus, a government official is entitled to qualified immunity "unless he (1) violated a constitutional right, and (2) that constitutional right was clearly established at the time." *Bradley v. Benton*, 10 F.4th 1232, 1238 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022). "We can affirm a grant of qualified immunity by addressing either prong or both." *Crocker*, 995 F.3d at 1240. And, "[i]f the evidence at the summary judgment stage, construed in the light most favorable to the non-movant, contains 'facts inconsistent with granting qualified immunity, then the case and the qualified immunity defense proceed to trial.'" *Bradley*, 10 F.4th at 1238 (quoting *Stryker v. City of Homewood*, 978 F.3d 769, 773 (11th Cir. 2020)).

Here, the parties do not dispute that the corrections officers acted under their discretionary authority. In granting the corrections officers qualified immunity, the district court did not state under which prong it granted the officers qualified immunity on. Because the district court did not find that the officers used excessive force, the district court seemingly granted qualified immunity on

the first prong—that the officers did not violate Ireland's Fourteenth Amendment right to be free from excessive force.

To establish a claim for excessive force in the Fourteenth Amendment context, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). We look to the following illustrative considerations to determine the reasonableness or unreasonableness of the force used:

> [(1)] the relationship between the need for the use of force and the amount of force used; [(2)] the extent of the plaintiff's injury; [(3)] any effort made by the officer to temper or to limit the amount of force; [(4)] the severity of the security problem at issue; [(5)] the threat reasonably perceived by the officer; and [(6)] whether the plaintiff was actively resisting.

*Id.* at 397. These considerations should be made without regard for the officer's subjective intent or motivation. *Id.* at 396–97. Indeed, "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." *Id.* at 397.

Viewing the facts in the light most favorable to Ireland: on August 24, at around 3:00 a.m., Ireland became increasingly agitated and fought with his cellmate. Officers responded to the altercation, with Officer Swartzentruber first to the scene at 3:20 a.m. Officer Swartzentruber entered the cell without backup. Before any physical force was applied to Ireland, Officer Swartzentruber orally commanded Ireland to sit down, which Ireland refused to

do. As Officer Swartzentruber reached down to grab the cellmate's "boat"—a plastic bed—at around 3:26 a.m., Ireland reached down and attempted to push it towards Officer Swartzentruber. Officer Swartzentruber ordered Ireland to sit down. According to Officer Swartzentruber, Ireland "tensed and took a step towards" him. This led Officer Swartzentruber to deploy his taser (a five-second cycle) at 3:27 a.m. Nurse Heavener, who witnessed this interaction while standing at the cell door, testified that Ireland was tased by Officer Swartzentruber because he "had thrown the boat out of the way[] and appeared to become aggressive towards the officer." After the officer tased Ireland, he requested emergency backup. Although Officer Swartzentruber ordered Ireland to lie flat on his stomach and to place his arms behind his back to be handcuffed, Ireland tried to stand up after the first taser deployment, and Officer Swartzentruber tased Ireland again for another five-second cycle.

Still able to move his arms, Ireland actually managed to remove one of the prongs of the taser. Ireland then sat up in a kneeling position. Officer Swartzentruber continued to order Ireland to lie flat on his stomach and to place his arms behind his back. Ireland refused.

Around 3:28 a.m., five backup officers—Officers Schwocho, Wiles, Sledzinski, Garlick, and Burrows—arrived at the scene and applied physical force in attempting to restrain Ireland. As the other officers arrived at the cell, Officer Swartzentruber advised them that Ireland had pulled out one of the prongs of the taser.

According to Officer Swartzentruber, Ireland actively resisted while the officers tried to handcuff Ireland and gain control of Ireland's limbs. As a result, Officer Swartzentruber used the taser to administer a drive stun to Ireland's upper back. The officers were then able to place one of Ireland's wrists in handcuffs. Officer Swartzentruber said Ireland continued to tense and resist as officers attempted to place Ireland's other arm behind his back. So Officer Swartzentruber used the taser to administer another drive stun to Ireland's upper back. The officers were then able to secure Ireland's other wrist in handcuffs.

The officers testified to the following as what occurred during this time period. Officer Wiles testified that when he arrived at the cell Ireland was "sitting up and had . . . taser prongs in his hands." According to Officer Wiles, when he started to assist in restraining Ireland, Ireland fought him and attempted to strike him with closed fists. Officer Wiles testified that Ireland became "very, very aggressive" and was "almost overpowering [the officers] at times." Officer Wiles, weighing approximately 180 pounds, sat on Ireland's back to try to get him into handcuffs, while Ireland's hands were underneath his stomach, and Officer Wiles struck Ireland twice, although the strikes had "no effect" because Ireland kept resisting.

When Officer Sledzinski arrived at the cell, he observed Ireland kicking Officer Swartzentruber. Officer Sledzinski grabbed Ireland's legs, as Officer Swartzentruber delivered a drive stun to Ireland's upper back, as described above. According to Officer

Sledzinski, Ireland resisted the officers' efforts to put his wrists in handcuffs, so Officer Swartzentruber administered another drive stun to Ireland's upper back, as described above. At this time, the officers were able to secure one of Ireland's wrists. While the officers attempted to gain control of his other wrist, Ireland began trying to bite the officers. Officer Sledzinski grabbed Ireland's neck and shoulder area to prevent him from biting anyone. Officer Sledzinski says Ireland continued to kick and resist the officers' efforts to restrain him. At approximately 3:30 a.m., Officer Sledzinski retrieved a pair of leg shackles to stop Ireland from kicking. According to Officer Sledzinski, while he was trying to apply the shackles to Ireland's legs, Ireland kicked him again, which led Officer Sledzinski to request a taser. Officer Swartzentruber gave Officer Sledzinski his taser, who used it to stun Ireland's legs while he finished securing the leg shackles.

When Officer Schwocho arrived at the cell, he observed Ireland resisting Officer Swartzentruber. Officer Schwocho began trying to hold Ireland down, as Officer Swartzentruber delivered a drive stun to Ireland's upper back, as described above. Officer Schwocho tried to secure Ireland's hands, but Ireland kept putting his hands under his stomach so that they could not put handcuffs on him. Officer Swartzentruber delivered the second drive stun, as described above. Officer Schwocho then gained control of Ireland's arms and put handcuffs on him. Because of Ireland's size (approximately 300 pounds), Officer Schwocho used two sets of handcuffs to restrain Ireland's arms. Once the handcuffs were

double locked, Ireland began trying to bite Officer Schwocho's fingers, despite the officer giving several warnings. To prevent Ireland from biting his fingers, Officer Schwocho redirected Ireland's head to point down to the floor and used the "under the jaw pressure point technique." According to Officer Schwocho, this technique achieved compliance. Officer Schwocho testified that, during this exchange, Ireland was resisting them.

When Officer Burrows arrived at the cell, he observed Ireland lying on his stomach and actively resisting the officers. Officer Burrows said Ireland cursed, spat, continually tried to push himself off the floor, and would not follow officers' commands to put his hands behind his back. Officer Burrows grabbed Ireland's left leg to prevent him from kicking anyone. While attempting to handcuff Ireland, Officer Burrows noticed that Ireland had "urinated all over himself and the floor." Officer Burrows said Ireland then kept trying to force his head and shoulders off the floor and attempted to spit on him.

When Officer Garlick arrived at the cell, he observed Ireland fighting the officers. Because the officers were struggling to restrain Ireland, Officer Garlick recommended the use of emergency restraint belts. He left the cell to retrieve them and returned approximately ten minutes later.

Ireland eventually lost consciousness before he was moved to the second cell without a camera and eventually to the third cell. After this entire encounter, Ireland was eventually taken in an ambulance to the hospital where he later died.

In parsing this timeline, there seem to be two periods of time relevant to our excessive force analysis. First, there is the period in which Officer Swartzentruber was alone with Ireland before the other officers arrived at Ireland's cell. Second, there is the period between the arrival of the additional officers to Ireland's cell and Ireland's departure to the hospital. We address each in turn.

As to the first period, even viewing the facts in the light most favorable to Ireland, from the perspective of a reasonable officer on the scene, Officer Swartzentruber did not use excessive force. To the degree that the particular claim against Officer Swartzentruber is premised on the fact that Officer Swartzentruber chose to enter the cell alone and engage Ireland instead of waiting for backup, that claim fails. This is because "[m]aintaining safety and order at [corrections facilities] requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Florence*, 566 U.S. at 326. Officer Swartzentruber made the decision to go into the cell due to a disturbance and the physical altercation between Ireland and Ireland's cellmate. A decision made to address a known disturbance—like Officer Swartzentruber's decision to enter the cell alone to address the altercation—should be given deference. *See id.*; *accord Kingsley*, 576 U.S. at 399.

And to the degree that the claim against Officer Swartzentruber is premised on that fact that Officer Swartzentruber engaged Ireland alone and deployed his taser twice before backup arrived, that claim also fails. This Court has

repeatedly upheld the reasonable use of a taser in the analogous Fourth Amendment context when conducting excessive force analysis. *See, e.g.*, *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (finding that the use of a taser by a single officer to effectuate arrest on noncompliant and orally abusive citizen did not constitute excessive force). Simply put, Officer Swartzentruber had the right to be in Ireland's cell after the altercation between Ireland and Ireland's cellmate, and Officer Swartzentruber was reasonable in his attempt to try to restrain an upright 322-pound man in a one-on-one setting.

As to the second time period, while a closer call, from the perspective of a reasonable officer on the scene, none of the officers used excessive force, even viewing the facts in the light most favorable to Ireland. We note that Ireland's Estate does not dispute that throughout this entire encounter Ireland—an approximately 300-pound man—did not comply with the officers' requests nor does it dispute the officers' accounts that Ireland was kicking, spitting, and biting—i.e., physically resisting the officers. The Estate also does not dispute that the physical altercation Ireland had with his cellmate initiated Ireland's encounter with the officers. Although Ireland's Estate argues that Ireland was unable to comply with the officers' commands due to the combination of alcohol withdrawal symptoms and the side effects of being tased, that does not change the facts that Ireland did not follow the officers' commands and that the officers were unable to subdue Ireland for a protracted period of time while he physically resisted their attempts to subdue

him. Further, there is no medical evidence suggesting that Ireland was suffering from alcohol withdrawal symptoms such as delirium tremens or that any of the officers knew of any symptoms. And while other inmates stated that Ireland told the officers that he was not resisting and could not comply with their commands because he had been tased, those inmates did not actually witness what was occurring inside Ireland's cell.

Ultimately, we cannot conclude that the officers' actions were objectively unreasonable, nor done with excessive force, *see Kingsley*, 576 U.S. at 396–97, as the need for force was apparent, given Ireland's behavior from the outset of his encounter with the officers. Officer Swartzentruber entered the cell to perform the lawful action of clearing the belongings of Ireland's cellmate. Over the course of the encounter, Ireland did not comply with verbal commands, and the undisputed record evidence shows that he became aggressive towards Officer Swartzentruber and the other officers. Against this backdrop, the use of a nonlethal taser deployment was reasonable. And the need for force from the other relevant officers continued after the initial taser deployment since, as the Estate admits, Ireland did not obey orders and kicked, spit, and bit at the officers as they attempted to restrain him.

From the perspective of a reasonable officer on the scene, the use of force was therefore justified and not excessive. Indeed, this Court has upheld the use of a taser in the similar context of Fourth Amendment excessive force analysis. *See, e.g., Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1300, 1306 (11th Cir. 2009) (finding

the use of a taser three times on a handcuffed and shackled arrestee was not excessive force where the arrestee refused verbal commands and flailed uncontrollably); *Draper*, 369 F.3d at 1278. The record evidence also establishes that Ireland's death was the result of organ failure, and there is no evidence in the record that the use of a taser, even repeatedly, or physical force caused his death. The Medical Examiner's report lists the manner of death as "[n]atural" and lists complications of withdrawal due to acute and chronic alcohol abuse and cirrhosis, with arteriosclerotic and hypertensive heart disease as contributing factors. Accordingly, no record evidence was presented that the taser or physical force caused or even contributed to Ireland's death.

Moreover, insofar as Ireland's Estate alleges claims for failure to intervene against the various officers who arrived at the cell and watched while other officers attempted to restrain Ireland, those claims also must fail. This is because a claim for failure to intervene requires an act of excessive force by the perpetrating officer in the first instance, which, as discussed above, did not happen here. *See Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986) (explaining that, in the context of an arrest, "[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983"); *see also, e.g.*, *Est. of Booker v. Gomez*, 745 F.3d 405, 422 (10th Cir. 2014) (applying same reasoning in a pretrial detention case).

Finally, Ireland's Estate has failed to meet its burden of showing that the alleged violations of Ireland's constitutional rights were "clearly established" at the time of the incident—here, August 2015. *See Bradley*, 10 F.4th at 1248; *Foy*, 94 F.3d at 1532. A government official's conduct "violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

Here, Ireland's Estate has failed to show that a reasonable officer would have understood his or her conduct was violating Ireland's constitutional rights in August 2015. Even viewing the facts in the light most favorable to Ireland's Estate, the incident began with Ireland fighting with his cellmate and then Ireland refusing Officer Swartzentruber's oral commands. When Officer Swartzentruber entered the cell to pick up the cellmate's belongings, Ireland tensed up and took a step toward him. Officer Swartzentruber then deployed his taser against Ireland, called for backup, and then tased Ireland again after Ireland continued to ignore the officer's commands. Even after the other officers arrived, Ireland continued to resist—e.g., by attempting to bite at the officers, by kicking the officers, by spitting at the officers, by removing the taser prongs, and by trying to push himself off the floor in direct

contravention of the officers' commands to lay on the floor.  In response, the officers took actions to physically restrain Ireland in order to make him comply with their orders.  Additionally, there is no evidence suggesting that the officers knew of any alcohol withdrawal-related symptoms that Ireland may (or may not) have been suffering at the time.  And, as noted above, we conclude that the officers' use of force was not objectively unreasonable given the circumstances.

As previously explained, the use of a taser multiple times on an inmate does not constitute excessive force where an inmate refuses to follow an officer's verbal commands and physically resists an officer who is attempting to bring the inmate into compliance. *See Mann*, 588 F.3d at 1300, 1306.  And "[w]hether the use of force was reasonable must be determined 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  Under the totality of the circumstances, a reasonable officer facing the same lack of compliance and physical resistance that Ireland displayed would not have understood that the force employed here constituted violations of Ireland's constitutional rights.  And Ireland's Estate has not met its burden in showing otherwise, i.e., that existing precedent has placed the constitutional question here beyond debate. *See al-Kidd*, 563 U.S. at 741.  Accordingly, we conclude that Ireland has failed to show that the officers' conduct violated clearly established law.

We therefore affirm the district court's entry of summary judgment as to Count 5.

### C.  State-Law Wrongful Death Claims (Counts 6 and 7)

Finally, Ireland's Estate also brings Florida law wrongful death claims against Sheriff Prummell and Corizon.  The claims raised against Sheriff Prummell and Corizon are slightly different. Against Sheriff Prummell, the district court granted summary judgment because Ireland's Estate had adduced no evidence of causation on a negligence claim.  Against Corizon, the district court entered summary judgment because the Estate had failed to provide pre-suit notice to Corizon as required under Florida law.  Both determinations were correct.

The Estate's claim against Sherriff Prummell is one of ordinary negligence.  Ireland asserts that the Sheriff negligently hired, trained, and supervised his employees.  To succeed on a claim of ordinary negligence, a plaintiff must allege a duty, a breach of that duty, causation, and damages.  *See Miller ex rel. Miller v. Foster*, 686 So. 2d 783, 783 (Fla Dist. Ct. App. 1997).  Even if we assume that Sheriff Prummell had a duty not to negligently hire, train, and supervise his employees and that he breached this duty, the claim against Sheriff Prummell still fails for lack of causation.  As the district court noted, Ireland's Estate "has no evidence regarding . . . how any such allegedly deficient procedure caused Ireland's death."  This is fatal to the claim.  The coroner's report listed the cause of death as natural complications of alcoholism.  And the Defendants' expert testified that the tasing did not contribute to

Ireland's death, which the Estate's expert does not dispute. Moreover, as noted by the district court, "no expert has testified that any delay in getting Ireland to the hospital caused his death." Relying on pure conjecture—with no evidence of causation to point to—Ireland's Estate cannot present a triable genuine issue of material fact, warranting the reversal of the grant of summary judgment for Sheriff Prummell.

The claim against Corizon is more straightforward. This claim is one of medical malpractice. And, under Florida law, a plaintiff must provide pre-suit notice to defendants in medical malpractice actions. Fla. Stat. § 766.106(2). Here, it is undisputed that Ireland's Estate did not provide that pre-suit notice, but still Ireland's Estate attempts to argue that the claim sounds in ordinary negligence. We conclude that it does not. *See id.* § 766.106(1)(a) (noting that the pre-suit notice requirements apply to any claim "arising out of the rendering of, or the failure to render, medical care or services"). Ireland's Estate cannot avoid the nature of the claim through artful pleading. Florida law is clear that courts must look beyond the label affixed by the plaintiff to ascertain the true nature of the claim. *See Omni Healthcare, Inc. v. Moser*, 106 So. 3d 474, 475 (Fla. Dist. Ct. App. 2012); *Dr. Navorro's Vein Ctr. of Palm Beach, Inc. v. Miller*, 22 So. 3d 776, 778 (Fla. Dist. Ct. App. 2009) (finding that a claim for negligence in laser hair removal is a medical malpractice claim "despite the plaintiff's creative dance around the obvious").

The Estate's claim against Corizon asserts that the medical personnel employed by Corizon negligently treated Ireland when they failed to fully review his medical file, failed to timely summon EMS, and failed to give him his prescribed medication. These factual assertions, however, constitute a claim for medical malpractice, not negligence. Indeed, under Florida law, the "duty of the hospital to select and review health care personnel arises under the medical malpractice statute." *St. Anthony's Hosp. Inc. v. Lewis*, 652 So. 2d 386, 387 (Fla. Dist. Ct. App. 1995); *Martinez v. Lifemark Hosp. of Fla., Inc.*, 608 So. 2d 855, 857 (Fla. Dist. Ct. App. 1992) (same). And when a plaintiff's "entire case arises out of negligent medical treatment, [s]uch negligent treatment is both necessary to the claims against the [the medical provider] and inextricably connected to them." *Martinez*, 608 So. 2d at 857. The Estate's attempt therefore to make this claim sound as a negligent supervision and hiring claim does not save the claim.

Because the state-law claim against Sheriff Prummell fails for lack of causation and the state-law claim against Corizon fails for failure to provide pre-suit notice, we affirm the district court's grant of summary judgment for Sherriff Prummell and Corizon as to Counts 6 and 7.

## IV.    CONCLUSION

For the reasons stated, we affirm the district court's grant of summary judgment.

**AFFIRMED.**